MAINE SUPREME JUDICIAL COURT                                 Reporter of Decisions
Decision:      2018 ME 149
Docket:        Yor-18-236
Submitted
 on Briefs:    October 10, 2018
Decided:       November 13, 2018

Panel:         SAUFLEY, C.J., and MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

IN RE CHILD OF MERCEDES D.


PER CURIAM

[¶1]  The mother and father of a child appeal from a judgment of the District Court (Biddeford, *Foster, J.*) terminating their parental rights to the child pursuant to 22 M.R.S. § 4055(1)(A)(1)(a) and (B)(2)(a), (b)(i)-(ii), (iv) (2017).  The mother challenges the court's denial of her motion to continue the termination hearing and appoint a guardian ad litem[1] for her.  The father challenges the sufficiency of the evidence supporting the court's determinations that he is parentally unfit and that termination of his parental rights is in the best interest of the child.  We affirm the judgment.

---

[1]  Although the motion was to continue the termination hearing and appoint a "guardian," the court properly treated it as a motion for appointment of a guardian *ad litem* for the mother.

## I. BACKGROUND

[¶2]  The following facts are drawn from the court's findings, which are supported by the evidence, and the procedural record.  *See In re Evelyn A.*, 2017 ME 182, ¶ 4, 169 A.3d 914.

[¶3]  In July of 2016, days after the child was born, the Department of Health and Human Services became aware of concerns regarding the newborn's safety while in his parents' care.  A safety plan was created for the family, requiring the parents to move out of the home of the child's paternal grandmother—whom the Department had deemed an unsafe person—and live with another member of the father's family.

[¶4]  The following month, the Department was notified that the father's family member could no longer provide housing to the family, and the Department also discovered that the parents had left the child alone with the father's mother in violation of the safety plan.  Consequently, on August 17, 2016, the Department filed a petition for preliminary protection and a child protection petition.  *See* 22 M.R.S. §§ 4032-4033 (2017).  The court granted the preliminary protection order the same day and ordered that the child be placed in departmental custody.

[¶5]  The court issued agreed-upon jeopardy orders as to the mother and father in September and December of 2016, respectively.  In the jeopardy orders, the court found that each parent had mental health issues, cognitive delays, and limited parenting skills, and did not have safe and stable housing. Additionally, the court found that the father had a history of anger issues.  The child remained in the Department's custody and was placed with the father's aunt, where the child has since lived.

[¶6]  In the spring of 2017, acting upon the Department's motion, the court directed that each parent undergo a court-ordered diagnostic evaluation (CODE) in order to assess mental health and cognitive issues.  *See* 22 M.R.S. § 4007(3) (2017); M.R. Civ. P. 35.  The resulting evaluation of the father did not indicate cognitive limitations, but the examiner diagnosed him as having "other specified personality disorder with narcissistic and antisocial features; attention deficit hyperactivity disorder; . . . and adjustment disorder with anxiety."

[¶7]  The mother failed to show for the examination when it was originally scheduled but eventually submitted to the examination a month before the hearing on the termination petition.  The examiner determined that the mother's intellectual functioning was "borderline for language-mediated

4

tasks" and "in the average range for non-verbal related intellectual tasks." He also determined that her vocabulary was insufficient to undertake the full battery of psychometric testing. Based on that assessment, the examiner reported that "it would be important for anybody [who] interacts with [the mother] to make sure that [the mother] understands what is being said." The examiner diagnosed the mother as having a cognitive disorder, not otherwise specified; attention deficit hyperactivity disorder; and post-traumatic stress disorder, in partial remission. The examiner's report did not reflect any explicit concerns that the mother lacked the capacity to participate meaningfully in the termination proceedings.

[¶8]  On July 14, 2017, the Department filed a petition to terminate the parental rights of each parent, and the court held a two-day hearing on the petition in March and April of 2018. Before the presentation of evidence on the first day of the hearing, the court addressed a motion filed by the mother that day for the court to continue the termination hearing and order the appointment of a guardian ad litem for her.[2] *See* M.R. Civ. P. 17(b). The motion

---

[2] Although the attorney representing the mother was present on the first hearing day, the mother herself did not appear, reportedly because of inclement weather. The mother's attorney made clear to the court that she was not requesting a continuance due to the mother's absence because the hearing would require a second day, which would allow the mother to be present. The mother attended the second day of the hearing and in fact presented her testimony then.

recited counsel's "concerns about the mother's competency" based on counsel's review of the CODE report, which counsel had received within several weeks before the hearing. When the court invited counsel to be heard on the motion, counsel stated to the court that, according to the CODE report, the mother has "very low vocabulary levels" and, as a result, had been unable to complete the testing process; that the mother functions at a "fairly low" level, creating concerns about whether the mother "understands what's actually happening today"; and that a "guardian . . . could be helpful," *see supra* n.1. The mother did not present the court with the CODE report itself at that time.

[¶9] After hearing from the parties, the court denied the mother's motion, stating,

> I have no affidavit from any mental health professional. I don't have any relevant portions of the CODE evaluation. I just have an assertion by counsel that her client is incompetent. . . . Appointing a guardian is serious business. What you're saying is a person is so incapacitated that they don't know what's going on. They can't actively participate in their presentation of the case, you know. That might be so, but I have nothing in front of me that confirms that.

[¶10] The court then proceeded with the termination hearing. The Department's first witness was the examiner who performed the mother's CODE evaluation. The CODE report for the mother was admitted in evidence, and the examiner testified extensively about the report's contents and

6

conclusions. None of the parties inquired about the mother's capacity to participate in the proceedings, however, and the motion to continue and for appointment of a guardian ad litem was not renewed on the basis of the resulting record.

[¶11] In May of 2018, the court issued a judgment in which it found, by clear and convincing evidence, that each parent (1) was unwilling or unable to protect the child from jeopardy and that the underlying circumstances were unlikely to change within a time reasonably calculated to meet the child's needs; (2) was unwilling or unable to take responsibility for the child, a circumstance that would not be alleviated within a time reasonably calculated to meet the child's needs; and (3) failed to make a good faith effort to rehabilitate and reunify with the child. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii), (iv). The court also found that termination of each parent's parental rights is in the child's best interest. *See* 22 M.R.S. § 4055(1)(B)(2)(a).

[¶12] In its judgment, the court made the following findings of fact, all of which are supported by competent evidence in the record:

> One of the recurrent concerns in this case has been [the father's] inconsistent visitation with [the child]. Initially, visits were offered three times a week and were supervised. [The father] missed a significant number of visits. The reasons he offered for that included that he had forgotten, he hadn't felt well, and his guinea pig had an abscess, among others. When [the father] didn't

call to cancel, [the foster parent] often drove [the child] into the visitation site, a trip of an hour and fifteen minutes each way. That lead the caseworker to insist that [the father] contact [the foster parent] in advance of the visit to confirm he would attend or the visit would be cancelled. When the visits were supervised by another agency, they were suspended three or four times due to [the father's] inconsistency. Each time they did not resume until the Department was able to convene a meeting and discuss the matter.

. . . When questioned at trial about why he had been so inconsistent with visits, [the father] replied "I guess I don't really have a reason why."

. . . .

. . . [The father] has made little effort to learn about and understand the medical care for his son. He is more than content to leave that chore to others. By the same token, he is not receptive to advice given by or through others. . . .

. . . .

[The father] has struggled throughout this case with priorities and consistency. Early on he obtained employment. He has worked hard to keep his job and to increase the hours and responsibilities. . . . At times, however, he has accorded his employment priority over the reunification process and, in turn, his child. It has interfered with his visit schedule. Although not directly stated, it appears to have interfered with his attendance at his son's appointments and, perhaps, his attendance at counseling as well. Although he was notified of [the child's] doctor and WIC appointments over the last nineteen months, [the father] attended only [the child's] six-week checkup and one WIC appointment. Not only was his attendance designed to demonstrate a willingness to take on all aspects of parenting, it was also intended to keep him informed about [the child's] health and development. [The father] fell short on both those goals, ceding the responsibility back to [the foster parent]. . . .

According to [the father], in his sessions with [his counselor,] they have been working on anger management skills, dealing with stress, and how to have self-control over his mind and his emotions. . . . Unfortunately, [the father's] attendance at counseling has been spotty. . . . Since he began treatment in the summer of 2016, [the father] has missed approximately 40 sessions—more than he actually attended. . . .

. . . .

Even now, [the father] is unable to acknowledge that it had been unsafe to leave [the child] with his mother. At trial, he went to some lengths to discount what he believed to be the Department's most serious complaint about [the paternal grandmother]—that she had been charged with child endangerment in the past, a charge he labeled as "really iffy." . . .

In general, [the father] finds it difficult to hear criticism or accept feedback/advice from others. In Family Team Meetings, he would sometimes be visibly angry and bark at others when the topic of missed visits was addressed. He appears to discount suggestions or advice from others until his own experience confirms it is sound. . . .

. . . .

It is true that [the father] has achieved some successes over the last year and one half. . . . But his participation in counseling has been sporadic and his visitation has been irregular. He has not undertaken the requested med management assessment. Those were tasks designed to alleviate jeopardy and he failed to follow through. . . .

The truth is, this case has moved forward in spite of [the father's] actions, not because of them. Visitation expanded and became less controlled in large part as an effort on the caseworker's part to entice [the father] to more fully engage. At trial, [the father] proudly pointed out that he has not missed or cancelled a visit since January 15, 2018. That is certainly an

accomplishment; however, it remains to be seen if he will maintain that over time. And it must be said that visitation now requires little of [the father]. [The foster parent] brings [the child] to [the father's] house and retrieves him at the end of the visit. Only recently has [the father] been asked to return [the child] back to [the foster parent's] home at the end of the Friday visit. A visit requires only that [the father] be at his home at the designated hour, not a significant burden.

There is evidence that [the father's] mental health continues to pose problems for his day to day functioning. Incidents over the life of this case reveal a young man who is impulsive and struggles to appropriately manage his emotions. Although he has been steadily employed, he has been unable until quite recently to secure housing. He has not accepted the parental responsibilities that were accorded to him in the reunification process, including visitation and attending medical appointments. He resists advice and assistance from others even when they have greater experience. And he fails to recognize potential risks and take steps to assess them, including in regard to his mother and his partner. Even if he made improvements in those aspects of his character now, there would still be the question of whether [the father] could sustain that effort over time. Meanwhile, [the child] has been in foster care, and with [the foster parent], since he was a month and a half old. . . .

. . . .

[The mother] has done virtually nothing to reunify with [the child]. She has not maintained contact with the caseworker, visited with her son, engaged in counseling and parenting education, or secured safe and stable housing in a timely fashion. [The mother] has rarely been employed and even then, for only a month or so at a time. [The CODE examiner's] evaluation, and [the mother's] actions, confirm that she is not able to safely parent a child or even visit on an unsupervised basis. Much of this inability may be due to her cognitive limitations, a factor that is not likely to significantly improve, even with time and intervention. The Court accepts [the CODE examiner's] conclusion that the prognosis for [the mother]

making the necessary changes essential to reducing risk to [the child] is poor.

. . . .

. . . [The child] is doing very well in the care of [the foster parents]. He is healthy, developmentally on target, and happy. There is evidence he is strongly connected to his foster parents and they to him. As the Guardian [ad litem] reported, [the child] views himself as part of that family. Terminating [the child's] contact with his father would not adversely affect [the child]. Terminating [the child's] relationship with the [foster parents], particularly at this stage of his development, would be traumatic. He would be separated from the only family he has ever known. That clearly would not be in his best interest.

(footnotes omitted.)

## II. DISCUSSION

[¶13] We address the parents' arguments in turn, beginning with the mother's contention that the court erred by denying her motion to continue the termination proceedings and appoint a guardian ad litem for her, followed by our consideration of the father's assertion that the evidence was insufficient to terminate his parental rights.

A.    Appointment of Guardian Ad Litem

[¶14] The mother asserts that the court erred by denying her motion to continue the termination hearing and appoint a guardian ad litem.[3] We review

---

[3] Although the mother argues on appeal that, in the context of a termination hearing, counsel's expression of concern about the parent's suspected diminished capacity is sufficient by itself to

for an abuse of discretion both a court's decision to appoint—or not appoint—a guardian ad litem, *see Kelley v. Snow*, 2009 ME 128, ¶ 12, 984 A.2d 1281, and its decision to deny a motion to continue, *see In re Arturo G.*, 2017 ME 228, ¶ 14, 175 A.3d 91. "A party seeking a continuance has the burden of showing sufficient grounds for granting the motion . . . ." *In re Trever I.*, 2009 ME 59, ¶ 28, 973 A.2d 752 (quotation marks omitted).

[¶15] Here, the basis for the mother's motion was limited to counsel's expression of concern regarding possible limitations on the mother's ability to understand "what's actually happening today" and to participate in a trial. As explained by counsel, those concerns arose from her review of the mother's CODE report and perhaps her own interactions with the mother. The mother did not provide the court with the CODE report at that time.[4] Counsel explained

---

warrant an evidentiary hearing to determine the parent's capacity, she did not request that the court conduct such a hearing, and consequently she did not preserve this aspect of her argument for appellate consideration. *See In re Anthony R.*, 2010 ME 4, ¶ 8, 987 A.2d 532 ("To preserve an issue for appeal, the issue must first be presented to the trial court so that the trial court has the opportunity to assess and act on the point to which the objection is directed."). Therefore, we address only the court's denial of the mother's motion to continue and appoint a guardian ad litem.

[4] After the court denied the motion and began the hearing, the CODE report was admitted in evidence, but the mother did not renew her motion or request that the court to reconsider its ruling in light of the report that was then part of the record.

We also note that on the second hearing date, the mother appeared and testified, allowing the court to make first-hand observations about her level of functioning. *See State v. Dyer*, 371 A.2d 1079, 1086 (Me. 1977) (holding that the court acted within its discretion by not inquiring into the competency of the defendant when the court "had the opportunity to observe the defendant and to evaluate his rational as well as factual understanding of the . . . proceedings and the sufficiency of his ability to communicate with his lawyer and assist him in presenting a meaningful allocution."). Even

12

to the court that a guardian ad litem would be "helpful" to assist the mother "through the process."

[¶16]   As framed in the mother's motion, the sole justification for a continuance was the requested appointment of a guardian ad litem.  Contrary to the mother's contention, the very limited record presented in support of the motion did not require the court to continue the proceedings and appoint a guardian ad litem.  Counsel did not explain, for example, why a guardian ad litem would be able to provide the mother with more guidance through the legal process—which was the focus of counsel's concern—than counsel herself could provide.  Further, in explaining the reasons for denying the motion, the court correctly noted that having "limited [cognitive functioning] is not the same as . . . [being] incompetent to proceed in this matter."  *See State v. Nickerson*, 2013 ME 45, ¶ 9, 66 A.3d 568 (stating that "it is well established that a party may be both mentally ill and competent to stand trial"); *see also State v. Ledger*, 444 A.2d 404, 419 (Me. 1982) ("[A] defendant may be mentally competent to stand trial although in some other respects his mind is unsound.").

---

then, the motion for appointment of a guardian ad litem was not renewed.  Beyond that, there is nothing apparent from her transcribed testimony that raises a question about her competence.

[¶17]  We recognize that an attorney bears the "responsibility to alert a court to [his or her client's] possible incompetence," *Middleton v. State*, 2015 ME 164, ¶ 15, 129 A.3d 962, and we are not critical of mother's counsel for bringing her concerns to the court's attention.  The question before us, however, is whether, based on the record presented to the court at the time it was asked to adjudicate the motion, the court abused its discretion by denying the mother's motion.  We conclude that the court did not do so.

B.      Parental Unfitness and the Best Interests of the Child

[¶18]  The father asserts that the evidence is insufficient to support the court's determinations that he is an unfit parent within the meaning of the child protection statutes and that termination is in the child's best interest.  "We review the trial court's factual findings that a parent is unfit and that termination of parental rights is in the child's best interest for clear error and the ultimate decision to terminate parental rights for an abuse of discretion." *In re Child of Kelcie L.*, 2018 ME 57, ¶ 3, 184 A.3d 387.

[¶19]  With respect to the issue of parental unfitness, the father argues that although some deficits identified in the December 2016 jeopardy order remained uncured at the time of the termination proceedings, those factors do not constitute parental unfitness.  As found by the court, those shortcomings

14

included his failure to participate in a medication management assessment for his mental health issues; his failure to manage his anger appropriately; and a significant number of unjustified missed visits with the child and counseling sessions. The court was entitled to find that the nature of these problems, which impeded the father's ability to safely and effectively parent the child, and the persistence of the problems despite more than a year and a half of extensive reunification efforts by the Department, are material indicia of his parental unfitness.

[¶20] Beyond that, the court's findings, which are not limited to the deficiencies noted above, are supported by the record and are sufficient to support the court's determination that the father is unwilling or unable to protect the child from jeopardy or take responsibility for the child within a time reasonably calculated to meet the child's needs, and that he failed to make a good faith effort to rehabilitate and reunify with the child. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii), (iv).

[¶21] Next, citing the progress he had made toward alleviating jeopardy and his "deep bond with the child," the father asserts that the court abused its discretion by concluding that termination of his parental rights is in the child's best interest. We have held, however, that a strong bond between a parent and

a child "is only one of *several* factors that the trial court must consider" in its best interest determination. *In re Michaela C.*, 2002 ME 159, ¶ 26, 809 A.2d 1245. The court is also required to consider—as it did here—"the needs of the child, including the child's age, the child's attachments to relevant persons, periods of attachments and separation, the child's ability to integrate into a substitute placement or back into the parent's home and the child's physical and emotional needs." 22 M.R.S. § 4055(2) (2017); *see also In re Jacob B.*, 2008 ME 168, ¶ 14, 959 A.2d 734. Moreover, the Legislature has stated that the purposes of the termination statute include "[e]liminat[ing] the need for children to wait unreasonable periods of time for their parents to correct the conditions which prevent their return to the family" and "[p]romot[ing] the adoption of children into stable families rather than allowing children to remain in the impermanency of foster care." 22 M.R.S. § 4050(2)-(3) (2017).

[¶22] At the time of the termination proceeding, the child was twenty months old and had been in foster care since he was six weeks old. Based on competent evidence in the record, the court determined that the progress made by the father during that eighteen-month period failed to meet the child's needs and the court-ordered rehabilitation and reunification plan, and that, rather than requiring the child to continue in the transience of foster care for an

uncertain amount of additional time, the child's best interest would be served by freeing him for adoption.[5]   The court did not abuse its discretion by concluding that termination of the father's parental rights is in the best interest of the child.

The entry is:

> Judgment affirmed.

Amy McNally, Esq., Woodman Edmands Danylik Austin Smith & Jacques, P.A., Biddeford, for appellant mother

Corey R. McKenna, Esq., Fairfield & Associates, P.A., Portland, for appellant father

Janet T. Mills, Attorney General, and Hunter C. Umphrey, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Biddeford District Court docket number PC-2016-35
FOR CLERK REFERENCE ONLY

---

[5] The court framed its best interest determination based in part on an expectation that the child's current foster parents would become his adoptive parents.  As we have stated, the question of whether termination should be ordered is distinct from the question of who should adopt a child post-termination, because the latter determination is made in a separate proceeding governed by 18-A M.R.S. §§ 9-301 to 9-315 (2017).  *In re Kenneth S.,* 2017 ME 45, ¶ 6, 157 A.3d 244.  The discussion in the judgment about the benefits of adoption by these particular foster parents, however, does not detract from the court's fundamental conclusion, which is based on a proper analysis and enjoys support in the record, that the father will remain parentally unfit for too long as measured from the child's perspective, and that the child's best interest will be served with the permanence that comes with adoption generally.