MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2026 ME 26
Docket:       Cum-24-426
Submitted
  On Briefs:  November 25, 2025
Decided:      March 17, 2026

Panel:        STANFILL, C.J., and MEAD, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

IN RE CHILD OF CASSIE S.


STANFILL, C.J.

[¶1]  Cassie S. appeals from an order of the District Court (Portland, *Woodman, J.*) finding that she placed her child in jeopardy by subjecting the child to medical abuse.  The mother does not contend that the evidence is insufficient to support the court's finding of jeopardy, but she has appealed from the jeopardy order for a variety of other reasons.  The mother argues that the court (1) violated her right to counsel in determining that she was not indigent and failing to appoint an attorney; (2) erred in continuing the jeopardy hearing beyond the 120-day deadline; (3) violated her right to due process when the judge did not recuse herself; (4) erred by drawing a negative inference from the mother's failure to call certain witnesses at the jeopardy hearing; and (5) violated the mother's First Amendment rights when it enjoined the mother from posting on social media, speaking to the media, and discussing any issues involved in this litigation.  The mother additionally contends that the

2

court erred in denying, without a hearing, her motion for relief from judgment under M.R. Civ. P. 60(b), which alleged ineffective assistance of counsel at the jeopardy hearing. We affirm the jeopardy order and the court's denial of the mother's Rule 60(b) motion. We remand the matter to the trial court for the court to modify the order restraining the mother from commenting on this case.

## I. BACKGROUND

[¶2] The following facts are drawn from the court's findings, which are supported by competent evidence in the record, and from the procedural record. *See In re Child of Radience K.*, 2019 ME 73, ¶ 2, 208 A.3d 380.

### A. Factual History

[¶3] Cassie S. is the mother of a child with a complex medical history beginning when the child was about six months old. When the child was twenty-one months old, the mother persuaded the child's doctor to perform an invasive procedure—a tracheotomy—to attempt to cure cyanotic spells she had observed. According to the mother, the tracheostomy did not ameliorate the cyanosis, so the child's medical providers recommended its immediate removal. The mother, however, insisted that the child's tracheostomy become permanent.

[¶4]   In the years that followed, the mother took the child to various medical providers in Maine and other states, many of whom recommended the removal of the child's tracheostomy.  The mother also reported to the child's doctor that the child was aspirating on liquids, and as a result, a gastrostomy tube was placed in the child's stomach.

[¶5]   Ultimately, the medical director of the child protection program at a Massachusetts medical center reported the mother to the Maine Department of Health and Human Services.  The medical director expressed concerns that the child had received inappropriate medical care at the urging of the mother.  As a result, the Department petitioned for a protection order in 2019, although that petition was ultimately dismissed.  Throughout the 2019 proceedings, the mother spoke to the press about the Department's efforts to remove the child from her care, resulting in published articles about the child's medical history and the mother's experience with the Department.

[¶6]  In September and October 2023, when the child was eight years old, the mother took him to a pediatric pulmonology specialist in New York City.  The child arrived in a wheelchair with a tracheostomy, gastrostomy tube, and leg braces.  Doctors conducted various medical tests and exams, all of which found no abnormalities.  The doctors observed no mobility issues even though

4

the child was wearing leg braces and the mother reported concerns with his balance and gait. The child's neurological examiner concluded that there was no evidence of a neuromuscular abnormality. The pulmonologist concluded that the child did not need the tracheostomy or gastrostomy tube, and that to begin the removal process, the child should be observed overnight with his tracheostomy capped. The mother refused to permit the child to undergo that evaluation. In fact, after the child's discharge from the New York hospital, the mother scheduled a procedure with a Massachusetts doctor to enlarge the child's tracheostomy, a procedure that the court ultimately blocked.

[¶7] On October 18, 2023, the medical center in New York filed a report with the Department expressing concerns that the mother was engaging in medical abuse of the child.

B.    Proceedings

[¶8] On December 6, 2023, the Department filed a petition for a child protection order but did not request a preliminary protection order (PPO). Days before the jeopardy hearing, the Department requested and received a PPO that allowed the mother to maintain custody but imposed conditions on her, including preventing her from moving forward with a procedure to enlarge the child's tracheostomy.

### 1. Case Management Conferences and the Department's Motion to Continue

[¶9]  The Department was unable to serve the mother with the petition until January 4, 2024, partially because the mother's privately retained attorney sent a letter to the Department ordering it not to meet with or contact the mother.  The court held a case management conference on January 11, 2024. During the conference, the court suggested that having a jeopardy hearing without additional experts "may not provide any further clarification.  I don't know the facts, and I don't know what has happened since [the 2019 proceedings], but the parties may wish to discuss a third expert or another expert or . . . if there can be an agreement to have [the child] seen by . . . an agreed upon expert. . . .  [T]here's got to be some more medical info—or documentation or expert's opinion—other than the ones that we've already heard."  When the Department replied that it planned to present only the child's medical providers, the court suggested that while information from the medical providers "is very important and relevant to this issue, . . . you might want to explore another expert that . . . can review all of the documentation, can review all of the medical reports and . . . give an opinion."

[¶10]  The court then issued an order compelling the mother to sign releases for the child's medical records.  The mother objected to this order

6

almost two months later, and she refused to sign the releases. The court held a trial management conference on March 4, which was continued to March 11 at the Department's request. At this conference, the court again ordered the mother to sign all releases.

[¶11] The court initially scheduled the jeopardy hearing for mid-May, but the Department moved to continue the jeopardy hearing. At a March 18 conference, during arguments on the motion to continue, the Department explained that it had retained an out-of-state expert on child medical abuse but the expert would be unable to finish his review and report by May because of the mass of medical records and the complicated nature of the case. The Department also expressed that the mother's delay in signing the releases meant that it had obtained only some of the child's records. The mother objected, arguing that there was no legal basis for a continuance, that the hearing needed to occur within 120 days of the petition, and that that day she had met with some of the child's medical providers, who were ready to testify in May.

[¶12] The court granted the Department's motion to continue, rescheduling the jeopardy hearing for July. It reasoned that the mother was not served until January 4, had objected to the case management conference being

held so soon after she had been served, had refused to sign releases for a couple of months, and had previously objected to scheduling the jeopardy hearing for mid-May.

2. **Proceedings Relevant to the Mother's Right to Appointed Counsel**

[¶13]  After the mother was served with the petition in January 2024, the court assigned counsel to represent her pending a later determination on whether she qualified for appointed counsel.  On January 31, 2024, the mother completed a financial affidavit in support of her request for court-appointed counsel.  The financial screener recommended[1] that the court find the mother ineligible for appointed counsel.  On February 12, 2024, after reviewing the mother's financial affidavit, the court denied her request for court-appointed counsel.  The court concluded that the mother was not indigent, and therefore not entitled to appointed counsel, because she earned $92,000 in 2023, expected to earn $73,000 in 2024, and also received $612 per month in child support.  *See* 22 M.R.S. § 4005(2) (2025) ("The court, if it finds the parent or custodian indigent, shall appoint legal counsel.").  The court ordered that the appointment of counsel would terminate on March 9, 2024, later extending it to March 11.

---

[1]  The court is not bound by the financial screener's recommendation.

8

[¶14]  The mother chose to begin representing herself at a March 4, 2024, trial management conference even though appointed counsel would not be removed until March 11.  When asked if she wanted to represent herself at the hearing despite the presence of her appointed counsel, she responded, "Yes, it is [what I want]."

[¶15]  On March 6, 2024, the mother completed a new financial affidavit and the screener recommended that the court find the mother partially eligible for court-appointed counsel.  The mother did not move for reconsideration of the court's determination that she was not indigent.

[¶16]  The mother was unrepresented from mid-March until the beginning of the jeopardy hearing in mid-July.  The mother's privately retained attorney filed a limited appearance immediately before the jeopardy hearing and represented the mother during the hearing.

### 3.    The Jeopardy Hearing, Post-Judgment Motions, and Appeal

[¶17]  On July 10, 11, and 12, 2024, the court held a jeopardy hearing regarding the mother and father.  When the mother entered the courtroom, she brought members of the public, including the press, to observe the hearing.  After ordering those individuals to leave the courtroom, the court issued a

broad, indefinite order enjoining the mother from posting on social media, speaking to the media, or discussing "any issues involved in this litigation."

[¶18]  On September 17, 2024, the court found that the child was in jeopardy and ordered that the child be placed in the Department's custody.  The court ordered the Department to work with an expert in child medical abuse to coordinate the best plan for the child's demedicalization and required the mother to continue to receive mental health treatment and undergo an in-depth psychological evaluation and risk assessment focusing on parental capacity.

[¶19]  The mother immediately filed a notice of appeal as well as two motions to stay the jeopardy order—one in the trial court and another in this Court.  Both motions to stay were denied.

[¶20]   On November 18, 2024, the mother moved, under M.R. Civ. P. 60(b), for relief from the jeopardy order based on ineffective assistance of counsel.  We stayed the mother's appeal from the jeopardy order pending the adjudication of that motion.  On January 21, 2025, the trial court denied the mother's Rule 60(b) motion without a hearing; the mother timely appealed.  *See* M.R. App. P. 2B(c).  We then consolidated the mother's appeals from the jeopardy order and from the denial of her motion for relief from judgment.

## II. DISCUSSION

**A.    The court did not err in finding that the mother had no right to appointed counsel.**

[¶21]  The mother contends that the court erred in determining that she was not indigent and that the court should have appointed an attorney to represent her.  *See* 22 M.R.S. § 4005(2) (2025).  She argues that she was prejudiced because she was deprived of counsel for the period leading up to the jeopardy hearing.

[¶22]  Because a parent's indigency is a factual determination, we review the court's finding for clear error.  *See State v. Smith*, 677 A.2d 1058, 1060 (Me. 1996) (explaining that a defendant's indigency is a factual determination); *see also State v. Lowden*, 2014 ME 142, ¶ 8, 106 A.3d 1134, *as corrected* (Apr. 16, 2015) (reviewing for clear error the finding that a criminal defendant was partially indigent).  The mother had the burden of proving indigence, *see Smith*, 677 A.2d at 1060, so to prevail she must demonstrate that the evidence compelled a contrary finding.  *See In re Destiny H.*, 2024 ME 66, ¶ 27, 322 A.3d 1183.

[¶23]  Contrary to the mother's argument, the evidence does not compel a finding that she was indigent, in whole or in part.  The mother's income is not insubstantial, and she had privately retained attorneys for other matters, such

as her divorce action. Indeed, the mother was able to retain counsel for the jeopardy hearing and appeal. The court did not err in determining that the mother was not indigent. Because there is no right to court-appointed counsel for parents who are not indigent, there was no error in declining to appoint counsel.

**B.    The court did not abuse its discretion in continuing the jeopardy hearing.**

[¶24]  The mother argues the trial court abused its discretion by granting the Department's request to continue the jeopardy hearing and by issuing the jeopardy order after the 120-day deadline provided in 22 M.R.S. § 4035 (4-A) (2025), requiring vacatur of the jeopardy order and dismissal of the petition.

[¶25]  We review a trial court's grant or denial of a motion to continue a child protection hearing for an abuse of discretion. *In re Child of Mercedes D.*, 2018 ME 149, ¶ 14, 196 A.3d 888.

[¶26]  Section 4035(4-A) provides that "[t]he court shall issue a jeopardy order within 120 days of the filing of the child protection petition." 22 M.R.S. § 4035 (4-A). As we have previously held, however, this section "does not provide for the dismissal of a jeopardy order as a remedy for an order entered after the 120–day period." *In re Cameron W.*, 2010 ME 101, ¶ 4 n.1, 5 A.3d 668.

12

[¶27] Moreover, section 4035(4-A) also provides that the 120-day deadline "does not apply if good cause is shown." 22 M.R.S. § 4035(4-A). In granting the continuance, the trial court found, with record support, that the mother contributed to the need for the continuance by refusing service for almost a month and refusing to sign releases, which delayed the Department's access to the child's medical records by three months from the start of the case and led to the inability of the expert on child medical abuse to finish his review and report in time to meet the 120-day deadline. Given the medical complexities in the case, there was good cause for the continuance. We also note that the mother does not explain how she was prejudiced by the continuance. The mother had custody of the child throughout this period. While she claims that witnesses who had agreed to testify in May were unwilling or unable to testify in July, the record does not support the assertion that the mother's witnesses did not testify because of the delay. We conclude that the trial court did not abuse its discretion in granting the Department's request for a continuance.

## C. There was no obvious error in the trial judge's failure to recuse from the jeopardy hearing.

[¶28] The mother argues that the trial judge should have recused herself because "numerous statements and rulings raised a reasonable question as to

[her] impartiality," including the judge's suggestion that the Department obtain an out-of-state medical child-abuse expert and her decision to grant a continuance to accommodate this expert.

[¶29]  "'Pursuant to the Maine Code of Judicial Conduct, a judge must recuse [her]self on motion for recusal made by any party in which [her] impartiality might reasonably be questioned or in which the judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding.'"  *Dalton v. Dalton*, 2014 ME 108, ¶ 23, 99 A.3d 723, *as corrected* (Nov. 13, 2014) (quoting *Charette v. Charette,* 2013 ME 4, ¶ 21, 60 A.3d 1264).

[¶30]  "[W]hen a party fails to make a timely motion for recusal, that failure constitutes an implicit waiver of the objection to the judge's qualification."  *In re Kaitlyn P.*, 2011 ME 19, ¶ 8, 12 A.3d 50; *see also MacCormick v. MacCormick,* 513 A.2d 266, 267 (Me. 1986).  This is because "[a] party should have no incentive to roll the dice for a favorable decision and then, if the decision is unfavorable, raise grounds for recusal of which she or her counsel had actual knowledge prior to the decision being made."  *In re Kaitlyn P.*, 2011 ME 19, ¶ 9, 12 A.3d 50 (alterations and quotation marks omitted).  We have explained,

> A party who has a reasonable basis for moving to disqualify a judge may not delay in the hope of first obtaining a favorable ruling and then complain only if the result is unfavorable. Not only is such a tactic unfair, but it may evidence a belief that the judge is not in fact biased.

*In re Michael M.*, 2000 ME 204, ¶ 13, 761 A.2d 865 (quotation marks omitted). Although the mother implicitly waived any objection to the trial judge, we review the judge's decision not to recuse for obvious error. *In re Kaitlyn P.*, 2011 ME 19, ¶ 9, 12 A.3d 50; *In re William S.*, 2000 ME 34, ¶ 8, 745 A.2d 991. Obvious error is a "seriously prejudicial error tending to produce a manifest injustice." *In re Child of Kaysean M.*, 2018 ME 156, ¶ 8, 197 A.3d 525 (quotation marks omitted).

[¶31]  We see nothing in the record to indicate a lack of impartiality requiring recusal. The judge simply warned the Department, as well as the mother, that the complexity of the case strongly suggested that an independent expert would be important. If anything, the judge's remarks suggested that she doubted the strength of the Department's case, not that she favored it. Following this recommendation, both parties obtained experts on medical child abuse. The court considered the testimony of both experts at the hearing and treated the parties fairly. Nothing about the pretrial suggestion to the parties

that the case would require expert testimony deprived the mother of a fair proceeding or amounted to obvious error.

**D.     Any negative inference made by the court from the mother's failure to call medical witnesses was harmless error.**

[¶32]  In the jeopardy order, the court noted that it was "significant" that none of the child's providers at the Massachusetts hospitals testified "even though they were on the Mother's witness list."  The mother argues that the court wrongfully inferred that the witnesses' opinions would be adverse to her because they did not testify.

[¶33]  A factfinder may not infer "whether a missing witness's testimony would be favorable or unfavorable."  *State v. Ellis*, 2025 ME 56, ¶ 5, 339 A.3d 794; *see State v. Brewer*, 505 A.2d 774, 777 (Me. 1985) ("[T]he failure of a party to call a witness cannot be treated as an evidentiary fact that permits any inference as to the content of the testimony of that witness."); *Budzko v. One City Ctr. Assocs. Ltd. P'ship*, 2001 ME 37, ¶ 18, 767 A.2d 310.  Here, although the court did not explicitly say that it made a negative inference or explain any inference it made, the court noted that it was "significant" that none of the Massachusetts providers testified.

[¶34]  We review evidentiary decisions for clear error or an abuse of discretion, *In re Kayla S.,* 2001 ME 79, ¶ 9, 772 A.2d 858, and need not vacate

the trial court's judgment if the error is harmless, *In re Caleb M.,* 2017 ME 66, ¶ 25, 159 A.3d 345. "In the context of a [child protection] proceeding, a preserved error is harmless if it is highly probable that the error did not prejudice the parents or contribute to the result in the case." *Id.* (quotation marks omitted). Here, the court was presented with the child's extensive medical records and notes, which included opinions from the child's providers at the Massachusetts facilities. The court heard testimony from numerous medical experts, including providers, supporting the conclusion that the mother's conduct constituted medical child abuse placing the child in jeopardy. Any negative inference concerning the absent witnesses was harmless because of "the great volume of evidence supporting the court's [jeopardy] findings." *In re Kaitlyn P.,* 2011 ME 19, ¶ 11, 12 A.3d 50.

**E.  The court did not err in entering an order enjoining the mother from publicizing the confidential proceeding, but the order is overly broad.**

[¶35]  The mother has a history of inviting members of the press, state legislators, or other members of the public to child protection proceedings. During the pendency of the prior petition, the mother spoke to the press about the case, resulting in newspaper articles about the child's medical history and the mother's experience with the Department. On the first day of the jeopardy

hearing in the current case, after multiple members of the public, including media, attempted to attend the hearing, the court issued the following order:

> This matter is confidential pursuant to Title 22 § 4007. The parties in this matter are enjoined and forbidden from speaking to the media, posting on any social media platform, or speaking about any issues involved in this litigation. Any dissemination of the kind is subject to sanction, including but not limited to fine and/or contempt of court.

The mother contends that the judge's order restricting her ability to discuss this case is an unconstitutional prior restraint under the First Amendment. Because the mother did not challenge this order in the trial court, we review the order for obvious error that "affects substantial rights or results in a substantial injustice." *See Childs v. Ballou*, 2016 ME 142, ¶ 9, 148 A.3d 291 (quotation marks omitted).

[¶36] Court orders that prohibit future communications are considered prior restraints on speech. *Alexander v. United States*, 509 U.S. 544, 550 (1993); *see also Childs*, 2016 ME 142, ¶ 18, 148 A.3d 291. "There is a 'heavy presumption against [the] constitutional validity' of any prior restraint on speech." *Childs*, 2016 ME 142, ¶ 18, 148 A.3d 291 (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976)); *see New York Times Co. v. United States*, 403 U.S. 713, 714 (1971). "The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on

expression imposed by criminal penalties." *Vance v. Universal Amusement Co.*, 445 U.S. 308, 316 n.13 (1980).

[¶37]  A prior restraint on speech is an extraordinary remedy, and for it to be permissible,

> the harm from the unrestrained speech must be truly exceptional. A prior restraint is permissible only where the harm expected from the unrestrained speech is grave, the likelihood of the harm occurring without the prior restraint in place is all but certain, and there are no alternative, less restrictive means to mitigate the harm.

*Shak v. Shak*, 144 N.E.3d 274, 278 (Mass. 2020) (citations and quotation marks omitted).  Because this order is a prior restraint that restricts the content of speech, it is subject to strict scrutiny.  *See Mowles v. Comm'n on Governmental Ethics & Election Pracs.*, 2008 ME 160, ¶ 12, 958 A.2d 897.  To satisfy strict scrutiny, a prior restraint on speech must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end."  *Ass'n of Indep. Pros. v. Me. Lab. Rels. Bd.*, 465 A.2d 401, 410 (Me. 1983) (quotation marks omitted).

[¶38]  The court's order relied on Title 22, section 4007, which provides that "[a]ll [child protection] proceedings and records shall be closed to the public, unless the court orders otherwise."  22 M.R.S. § 4007 (2025); *see also* 22 M.R.S. § 4008 (2025) (limiting the release of records and information connected to child protection cases).  There is no question that the state has a

compelling interest in ensuring that child protection proceedings remain confidential. Safeguarding the details of a child's alleged abuse and medical conditions is of paramount importance. *See Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 607–08 (1982) (protecting the physical and psychological well-being of a minor is a compelling interest); *see also Handler v. Mayhew*, 841 F. Supp. 2d 443, 445 (D. Me. 2012) ("[T]he state has a recognized interest in protecting child victims from undue trauma and humiliation . . . ." (quotation marks omitted)).

[¶39] However, the trial court's order restraining the mother's speech is not narrowly tailored to ensure confidentiality throughout the proceedings and to protect the child's well-being. A restriction on speech is narrowly tailored if it does not "unnecessarily circumscribe protected expression." *In re Dunleavy*, 2003 ME 124, ¶ 30, 838 A.2d 338 (quotation marks omitted).

[¶40] The Supreme Court of Pennsylvania held that, in an ongoing child protection case, an order forbidding a parent from communicating details to the public which would tend to identify the child, including the use of the parent's name in public communications about the child protection case or child abuse generally, was a permissible restraint on speech. *S.B. v. S.S.*, 243 A.3d 90, 113 (Pa. 2020). The Court explained that the order restricting speech

affords Appellants ample opportunity to disseminate all of their thoughts into the marketplace of ideas without restriction on the content of their message. The gag order further allows Appellants to voice all of their opinions regarding issues important to them, including parental alienation, child sexual abuse, and placement of children in the custody of sexually abusive parents, and to testify about these issues before governmental bodies in an effort to remedy these vital societal concerns. The only limitation on Appellants' speech lies in the manner of communication, as they are precluded from conveying such public speech in a way that exposes Child's identity and subjects him to harm.

*Id.* at 107.

[¶41] In contrast to the order approved in *S.B.*, here, the court issued a sweeping restriction that prevents the mother from "speaking to the media, posting on any social media platform, or speaking about any issues involved in this litigation." This restraint on speech appears to preclude political speech such as advocacy for reform of the child protection system. It may also prevent the mother from speaking to the media and posting on social media in general. The mother's ability to speak to the press about her experience with this case as a means of advocating for policy or governmental change is the exact kind of "core speech" that the First Amendment is intended to protect. However, disclosing information which would tend to identify the child is not core speech and may be restricted given the government's compelling interest in protecting the child from harm.

[¶42]  Likewise, a prior restraint with no definite term may be overbroad, depending on the circumstances.  *See Vance,* 445 U.S. at 316 (striking down obscenity statute on ground that it restrained speech for period of indefinite duration); *see also Wacko's Too, Inc. v. City of Jacksonville*, 658 F. Supp. 3d 1086, 1122 (M.D. Fla. 2023), *aff'd*, 134 F.4th 1178 (11th Cir. 2025) ("A permissible prior restraint requires a time limit on when the decisionmaker must issue the license."); *Microsoft Corp. v. United States Dep't of Just.*, 233 F. Supp. 3d 887, 900-01 (W.D. Wash. 2017).

[¶43]  Although the State has a compelling interest in restricting access to child protection proceedings and enforcing nondisclosure of private information, the court's order is not narrowly tailored to achieve that interest. We thus vacate the order restraining the mother's speech and remand to the trial court for modification, including by providing a time limit and narrowing the order's scope to encompass only the disclosure of confidential information or information that would tend to identify the child.

**F.    The court did not err in denying the motion for relief from judgment without holding a hearing.**

[¶44]   Following the process we have outlined for raising a claim of ineffective assistance of counsel, the mother moved for relief from judgment

22

under M.R. Civ. P. 60(b)(6). *See In re Destiny H.,* 2024 ME 66, ¶¶ 38-42, 322 A.3d 1183. The court denied the motion without a hearing.[2]

[¶45] A court is not required to hold a hearing on every motion for relief from judgment alleging ineffective assistance of counsel. *In re Child of Shaina T.,* 2019 ME 107, ¶ 17, 211 A.3d 229; *In re David H.,* 2009 ME 131, ¶ 34, 985 A.2d 490. We have said that "[t]he trial court has broad discretion in determining what process is necessary to meaningfully assess a parent's claim while balancing the State's important interest in expeditiously establishing permanent plans for children. Such a determination will necessarily call upon a trial court to tailor the process to the facts and circumstances of each case." *In re Child of Shaina T.,* 2019 ME 107, ¶ 17, 211 A.3d 229 (quotation marks omitted).

[¶46] The court's decision whether to hold an evidentiary hearing on a motion for relief from judgment is reviewed for an abuse of discretion. *See Smith v. Kennard*, 496 A.2d 660, 663 (Me. 1985) (explaining that "the court acted within its discretion in ruling on [the] motion for relief from judgment

---

[2] The mother thereafter moved for further findings of fact and conclusions of law on the court's denial of the Rule 60(b) motion, and she argues on appeal that the court's denial of the motion was error. However, we reiterate that motions under M.R. Civ. P. 52 for findings of fact are not appropriate when there has been no evidentiary hearing. M.R. Civ. P. 52(a) (requiring findings of fact upon request only "[i]n all actions tried upon the facts without a jury"); *see In re Children of Kacee S.,* 2021 ME 36, ¶ 10 n.4, 253 A.3d 1063 ("The court did not take evidence in connection with its denial of the M.R. Civ. P. 60(b) motion, so the M.R. Civ. P. 52(b) motion was not appropriate.").

without holding an evidentiary hearing.").  In reviewing the court's denial of the motion, we "determine whether the mother has made a prima facie showing of ineffective assistance of counsel sufficient to justify a remand to the trial court for a hearing on the claim."  *In re Children of Kacee S.*, 2021 ME 36, ¶ 21, 253 A.3d 1063.

[¶47]  A parent claiming ineffective assistance of counsel in a child protection case must show that "(1) counsel's performance was deficient, i.e., that there has been serious incompetency, inefficiency, or inattention of counsel amounting to performance below what might be expected from an ordinary fallible attorney; and (2) the deficient performance prejudiced the parent's interests at stake in the . . . proceeding to the extent that the trial cannot be relied on as having produced a just result."  *In re Destiny H.*, 2024 ME 66, ¶ 26, 322 A.3d 1183 (alterations and quotation marks omitted).

[¶48]  The mother's motion alleges that the attorney who represented her at the jeopardy hearing failed to issue out-of-state subpoenas for critical medical witnesses and did not move to continue the jeopardy hearing to allow time to do so.  The mother did not subpoena the witnesses during the period leading up to the hearing when she was self-represented, and alleges she was unaware that she could.  The motion further states that the attorney was

representing her at the jeopardy hearing under a limited appearance agreement. *See* M. Bar. R. 1.2(c). The entry of limited appearance was filed with the court and specifically recited that no continuance was being requested, that the appearance would commence on the first day of the jeopardy hearing and end at the conclusion of the hearing, and that the attorney would "have no further obligations or duties in this matter." Indeed, the mother's brief to this court specifically confirms that she agreed that the attorney's representation would *not* include subpoenaing witnesses.

[¶49] Based on the allegations contained in the motion, as supported by the entry of the limited appearance, it is clear that the mother's attorney did exactly what she was hired to do. There is no claim that the attorney's performance during the trial was ineffective. The claim is based on the failures to subpoena witnesses or move to continue the trial, both of which were expressly outside the scope of the limited representation.

[¶50] Moreover, as we have already explained, there was no unconstitutional denial of counsel in the period leading up to the trial. And, as we have long held, a self-represented litigant is held to the same standards as an attorney with respect to the rules. *Estate of Turcic*, 2017 ME 118, ¶ 5, 164 A.3d 134. Therefore, there can be no claim for ineffective assistance of counsel

simply because the mother may have been unaware of the procedure to subpoena witnesses who were outside of Maine.

[¶51] Because the mother's motion did not make a prima facie showing that counsel's performance was deficient, the court did not abuse its discretion by denying the mother's motion for relief from judgment.

The entry is:

> Judgment affirmed as to the jeopardy order and the denial of the mother's Rule 60(b) motion. The order restricting the mother's speech is remanded for modification in accordance with this opinion.

---

Scott F. Hess, Esq., The Law Office of Scott F. Hess, LLC, Augusta, for appellant Mother

Aaron M. Frey, Attorney General, and Hunter C. Umphrey, Asst. Atty. Gen., Office of the Attorney General, Bangor, for appellee Department of Health and Human Services

Portland District Court docket number PC-2023-67
FOR CLERK REFERENCE ONLY