MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2013 ME 97
Docket:        Som-12-494
Submitted
 On Briefs:    September 26, 2013
Decided:       November 12, 2013

Panel:         SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

IN RE H.C. et al.

GORMAN, J.

[¶1]  The biological parents of H.C. and D.C. appeal from a judgment of the District Court (Skowhegan, *French, J.*) terminating their parental rights to their then one-year-old son and three-year-old daughter pursuant to 22 M.R.S. § 4055(1) (2012).  The parents assert that the court erred in finding that they voluntarily and knowingly consented to the termination of their parental rights.  Because we conclude that the court rationally could have found clear and convincing evidence to support its factual findings that the parents' consents were executed voluntarily and knowingly, we affirm the judgment.

## I.  BACKGROUND

[¶2]   The parents' decisions to terminate their parental rights to their children occurred on the eve of a hearing scheduled on a petition to terminate parental rights.  The Department of Health and Human Services (Department) had

filed the petition after these children and the mother's eldest child[1] had been in the Department's custody for thirteen months as a result of a child protection proceeding. The children were placed in the Department's custody on August 16, 2011, pursuant to a preliminary protection order (*Mullen, J.*) because the parents were emotionally abusive to the children, were physically abusive to the daughter, and subjected the children to dangerous living conditions and ongoing neglect. After the children were removed from their care, both parents were diagnosed with borderline intellectual functioning and personality disorders. Child Abuse and Neglect Evaluators Program (CANEP) evaluations described the mother as cognitively limited with little insight into her contributions to her children's developmental problems, and the father as having difficulty in making decisions without excessive reassurance from others and having little understanding of the developmental needs of his children.

[¶3] By agreement of the parents, the Department, and the children's guardian ad litem, the court (*Darvin, J.*) issued a jeopardy, judicial review, and permanency plan order on September 27, 2011. In that order, the court found that when the children came into the Department's custody they were dirty and had untreated dental conditions, bizarre eating habits, and significant developmental

---

[1] The mother's eldest child has a different father. The Department withdrew its petition for termination of parental rights as to the eldest child, and no appeal is pending with regard to that child.

delays—all as a result of neglect by their parents. In June of 2012, after nine months of unsuccessful rehabilitation and reunification efforts, the Department petitioned to terminate the mother's and father's parental rights to the children. On September 26, 2012, the day before a scheduled contested hearing on the termination petition, both parents appeared in court and each represented through individual counsel that he or she intended to consent to the termination.

[¶4] The court conducted an individual colloquy with each parent. It discussed with the mother her right to a contested hearing, the voluntariness of her decision, the length of her deliberation on the decision, and her understanding of the effects of the decision. When the court inquired into the mother's motivation, the mother explained that she did not believe she would "win" the contested hearing because of her "parenting issues" and her negative CANEP evaluation. The mother also said that she believed her consent would help secure her continued presence in the life of her eldest child, based on a "deal" she struck with the Department. The mother's attorney clarified that there was a plan to have the eldest child placed with his biological father, and that such a placement would allow the mother to have some ongoing contact with that child. The attorney also told the court that he had advised the mother of the "very real possibility" that her parental rights to that child would also be at issue if the placement were not

4

successful and the Department then petitioned to terminate the parental rights of that child's biological father.

[¶5] In response to the court's questions, the mother told the court that she had had enough time to go over the consent form with her attorney, that she understood the form, and that she had no questions about "what it says or what it means." The court then stated: "Okay. If you think you understand it and you are choosing of your own free will to give up your right to a trial and agree to termination of your parental rights, you can sign it in my presence. If you don't— if you have any questions or you feel you want a trial, don't sign it." The mother then signed the consent form, which stated in pertinent part, "I hereby knowingly and voluntarily consent to the termination of my parental rights."

[¶6] The court next spoke directly to the father, who had been present in the courtroom throughout the court's conversation with the mother. The court began by asking what he had decided to do that day. He responded that he had decided to "sign [his] rights." When the court asked him why he had decided to waive his right to a contested hearing, the father initially replied that he was "still iffy" but went on to state that, despite the time that had already passed, he "still got a little bit of stuff to work out" and that the children were well taken care of in their foster placement. The father stated that he did not want to "disturb" that situation, and wanted to "focus on what [he] need[ed] to get done." On further questioning, the

father conceded that he was waiving his right to a contested hearing because he had not done everything necessary to be a proper parent and it would be in the children's best interest to be with their foster family. The court then asked whether the father understood the effects of his decision, and he replied affirmatively.

[¶7] When the court asked the father whether he was making this decision of his own free will, the father responded that, although at first he felt that he was "being forced to have my rights terminated," he conceded that the Department "has stuff on me that I ain't able to fight." The father's attorney explained that the father understood that his chances of prevailing at a contested hearing were thin in light of his negative CANEP evaluation, the fact that his own therapists were "not saying he's able to do it," and a recommendation from the guardian ad litem that the court terminate his parental rights. The court then confirmed that the father had thought about the decision, was making the decision freely, and understood that the effect of termination would be that "somebody else will make all the parenting decisions." The court then stated: "Okay. If you want to give up your right to a trial and have the court terminate your parental rights, you may sign the paper that's in front of you. Have you gone over it with [your attorney]?" After confirming that he had reviewed the form with his attorney and that he understood it, the father signed the consent form.

6

[¶8] The court, satisfied that each parent had given the decision due consideration and understood his or her right to a contested hearing and the effect of the termination judgment, found that the father and mother had voluntarily and knowingly executed his or her consent and ordered the termination of their parental rights. This appeal followed.

## II. DISCUSSION

[¶9] The parents contend that they did not knowingly and voluntarily consent to the termination of their parental rights to their children because they did not understand the implications of their decisions, due in part to their cognitive limitations. The mother further asserts that her consent was fraudulently secured by an unauthorized "deal" offered by the Department that would allow her contact with her eldest child if she relinquished her rights to her younger children.

[¶10] Neither the father nor the mother presented these concerns to the court during the September 26, 2012, hearing or by a post-judgment motion. *See, e.g.,* M.R. Civ. P. 52, 59, 60. Their failure to do so means that the court had no opportunity to make further findings of fact or conclusions of law with respect to the parents' consents. In the absence of a motion for such additional findings and conclusions, we assume that the court found all the facts necessary to support its judgment to the extent those facts are supported in the record. *See Coastal Ventures v. Alsham Plaza, LLC*, 2010 ME 63, ¶ 19, 1 A.3d 416.

[¶11]  A court may order the termination of parental rights upon finding by clear and convincing evidence at least one statutory basis of parental unfitness, or with voluntary and knowing parental consent.  22 M.R.S. § 4055(1)(B).  In light of the statute's silence on the requisite standard of proof for terminating parental rights pursuant to 22 M.R.S. § 4055(1)(B)(1)—that is, by parental consent—we take this opportunity to clarify that the standard is likewise clear and convincing evidence.  This is because the termination of parental rights interferes with a fundamental liberty interest, regardless of whether the termination order is justified by parental consent or otherwise.  *See Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982) (the parent-child relationship is a fundamental liberty interest in which the state cannot interfere without providing the parents fundamentally fair procedures); *In re Daniel C.*, 480 A.2d 766, 771 (Me. 1984) ("due process requires proof of factual allegations by clear and convincing evidence in proceedings to terminate parental rights").  We will therefore affirm a judgment terminating parental rights if a review of the record demonstrates, inter alia, that the trial court rationally could have found clear and convincing evidence in that record to support the necessary factual findings as to the basis for termination provided in 22 M.R.S. § 4055(1)(B)(1) or (2).  The clear and convincing standard requires us to review the evidence for clear error.  *See In re David H.*, 637 A.2d 1173, 1175 (Me. 1994).

8

In light of the record evidence before us, we are not persuaded by the parents'
contentions.

A.      Knowing and Voluntary Consent

[¶12]  Title 22 does not expound on what is necessary for a valid consent to
termination beyond requiring that it be executed in writing before a judge and that
a judge explain the effects of a termination order.  22 M.R.S. § 4055(1)(B)(1).
We have, however, analogized the requisites and validity of parental consent in the
termination context to the requirement of surrender-release in the adoption context.
*See In re Amanda N.*, 1998 ME 115, ¶ 5, 710 A.2d 264.  Pursuant to Maine's
adoption statute, parents placing a child for adoption with an agency must execute
a surrender-release—a "voluntary relinquishment of all parental rights to a
child"—in the presence of a judge.  18-A M.R.S. §§ 9-102(k), 9-202(a) (2012).
A court may approve a surrender-release after it has, inter alia, explained to the
parents their rights and the effects of the surrender-release and determined that it
was freely given.  *See* 18-A M.R.S. § 9-202(b) (2012).

[¶13]  In both contexts, in order to protect a parent's fundamental right to
raise his or her children, a court must, at minimum, (1) explain to the parent his or
her parental rights and the effects of his or her decision thereon, (2) inquire into the
parent's understanding of the effects of the decision, and (3) determine that the
parent's decision is freely given.  *Cf. In re Amanda N.*, 1998 ME 115, ¶ 5,

710 A.2d 264 (affirming the trial court's judgment to terminate a mother's parental rights after noting the court's "extensive inquiry into the mother's understanding of the effect of her consent"); *In re Danielle B.*, 685 A.2d 770, 770 (Me. 1996) (stating that the trial court had probed into a father's "understanding of the effect of [his] consent, the effect of a judgment of termination, and whether his consent was knowing and of his own free will"); *see also In re Scott S.*, 2001 ME 114, ¶ 20 & n.12, 775 A.2d 1144 (recognizing in both the Maine and Federal Constitutions a parent's fundamental right to raise and nurture his or her children). A voluntary and knowing surrender-release or consent to termination may be set aside only on the basis of fraud, duress, mistake, or incapacity. *See In re Amanda N.*, 1998 ME 115, ¶ 1, 710 A.2d 264; *In re David*, 256 A.2d 583, 587-88 (Me. 1969). This is so because a child's interest in the finality of these proceedings "outweighs a parent's desire to revoke the consent in circumstances where the consent was knowingly and voluntarily executed." *In re Amanda N.*, 1998 ME 115, ¶ 6, 710 A.2d 264.

[¶14] The parents assert that they lacked an understanding of the effects of their consent due to their cognitive impairments, and further contend that they were given insufficient time to contemplate the termination decision. We disagree. From our review of the entire record in this case, we conclude that the trial court rationally could have found clear and convincing evidence to support its finding

that the parents consented knowingly and voluntarily, despite their cognitive limitations and in light of the length of their reflection on this decision.

[¶15] First, the court explained clearly the effects of the consent to both parents, stating that they would be giving up the right to a contested hearing on the termination petition and that someone else would thereafter make all of the parenting decisions for the children, including where and with whom they would live. Second, the court's inquiry into the parents' understanding of the effects of a termination judgment was probing and included questions about the parents' motivations and their access to assistance of counsel. Third, the court pointedly asked the parents whether they were making the decision freely. Given the court's questions, and the responses to those questions from the parents, the court had more than a sufficient basis for determining that each parent was making a voluntary and knowing decision.

[¶16] Finally, nothing in the record suggests that the parents were mentally incompetent to participate in the proceeding. To prevail on a claim of incapacity, the asserting party must prove that he was unable to reasonably understand the nature and consequences of the consent. *Cf. In re Estate of Marquis*, 2003 ME 71, ¶ 14, 822 A.2d 1153. Where, as here, there has been no previous adjudication of incompetency, a court may inquire into whether a party's act was a departure from the normal pattern of similar transactions. *Cf. Bragdon v. Drew,* 658 A.2d 666,

668-69 (Me. 1995). In this case, the parents' cognitive limitations were disclosed to the court throughout the child protection process, and their consent was not a departure from prior related decisions: both parents had waived the summary preliminary hearing and voluntarily agreed to the jeopardy order and to three judicial review orders in advance of their consent to the termination judgment. At no time prior to this appeal did either parent raise any concerns about his or her mental capacity. On this record, the parents have not established that they were unable to understand the nature and consequences of their decisions.

B.    The Mother's Fraud Allegation

[¶17]  The mother additionally asserts that her consent was fraudulently secured because she relied on an unauthorized "deal" offered by the Department that would allow her to have contact with her eldest child if she relinquished her parental rights to her younger children. To prevail on a claim of fraudulent misrepresentation, a party must prove, inter alia, that she justifiably relied on a false representation of a material fact. *See Maine Eye Care Assocs. P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707.

[¶18]  The mother points to no evidence that her consent was fraudulently secured other than her solitary statement to the court concerning the "deal." When the court asked about her motivation, however, the mother stated that she was consenting to the termination not only because of the "deal" but also because she

did not believe she would prevail at the contested hearing in light of her "parenting issues" and her negative CANEP results. The mother's attorney had also advised her of the "very real possibility" that she would be back before the court regarding her parental rights to her eldest child. We conclude that the mother's contention that she relied on the alleged "deal" is unsupported by the evidence and therefore insufficient to invalidate her consent. *See In re Danielle B.*, 685 A.2d at 771 (concluding that the trial court did not abuse its discretion by denying a father's motion for relief from judgment based on his assertion that he had been falsely assured that he could have visitation with his child after a termination judgment).

The entry is:

Judgment affirmed.

---

**On the briefs:**

Wayne Doane, Esq., Exeter, for appellant father

Wendy D. Hatch, Esq., Waterville, for appellant mother

Janet T. Mills, Attorney General, Nora Sosnoff, Asst. Atty. Gen., and Xi Chen, Law Student Intern, Office of the Attorney General, Augusta, for appellee Department of Health and Human Services