MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:      2026 ME 55
Docket:        Ken-25-359
Argued:        March 3, 2026
Decided:       June 25, 2026

Panel:         STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ., and
               HJELM, A.R.J.
Concurrence:   CONNORS, J.


# IN RE CHILD OF MINDY P.


HJELM, A.R.J.

[¶1] Mindy P.'s parental rights to one of her children were terminated by an order issued by the District Court (Augusta, *Dieterich, J.*). The termination order was predicated upon the consent given by a guardian ad litem (GAL) who had been appointed to represent the mother's interests. The mother appeals, arguing, among other things, that the process used by the court to appoint the GAL violated her right to due process.[1] We agree with this contention and therefore vacate the judgment and remand for further proceedings.

---

[1] The mother also argues that she was deprived of effective assistance of counsel during the proceedings. Because we vacate the judgment on other grounds, we do not directly address this issue, although we discuss the duties owed by an attorney who represents a parent both when suspecting that the parent needs a GAL and, if one is appointed, while continuing to represent the parent, *see infra* ¶¶ 33-34 & n.12.

## I. BACKGROUND

[¶2]  We describe the relevant history of this case, drawn from the procedural record.  This description goes into some detail as necessary to explain the process that resulted in the appointment of the GAL and its consequences as the case progressed.

[¶3]  In early June 2023, the Department of Health and Human Services filed a petition for a child protection order and a request for a preliminary protection order regarding the mother's youngest child, who is now five years old.[2]  In the petition, the Department asserted, among other things, that the Department had been involved with the mother "episodically since 2017 with concerns for substance abuse, untreated mental health issues, and neglect to the children."  The court (*Woodman, J.*) entered a preliminary child protection order granting custody of the child to the Department and scheduled a summary preliminary hearing for later in June.  The mother did not appear at that hearing or otherwise request to be heard, so the preliminary protection order placing the child in the Department's custody remained in effect.  *See*

---

[2]  The mother has three children, but this appeal addresses only the termination of her parental rights to the youngest.  The child protection proceeding encompassed one of the mother's other children.  The record before us indicates that that other child is in a permanency guardianship.  *See* 22 M.R.S. § 4038-C (2026).

22 M.R.S. § 4034 (2026). A jeopardy hearing was scheduled for August and was continued several times before the hearing was held the following May.

## A. Appointment of the mother's Rule 17(b) GAL, August and September 2023

[¶4] On August 31, 2023, about a week before the jeopardy hearing was to be taken up on a trailing trial list, the court (*Daniel Mitchell, J.*) met with the mother's attorney, the attorney for the Department, and the child's GAL to address an oral request presented by the mother's attorney that a GAL be appointed pursuant to M.R. Civ. P. 17(b) to represent the mother's interests.[3] No motion had been filed, and it appears that the conference had not been scheduled in advance. The mother asserts—and there is no record evidence or suggestion to the contrary—that she was never personally notified that this conference would take place or that her competency was being called into question. The conference was recorded but not entered on the docket.

---

[3] Maine Rule of Civil Procedure 17(b) states:

> Whenever a minor or incompetent person has a representative, such as a general guardian, conservator, or other like fiduciary, the representative may sue or defend on behalf of the minor or incompetent person. A minor or incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for a minor or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the minor or incompetent person. In any action in which there are or may be defendants who have been served only by publication and who have not appeared, the court may appoint an agent, guardian ad litem, or next friend to represent them.

4

[¶5]   During the conference, the mother's attorney stated that during "virtually every interaction [he'd] had with [the mother] she's been dysregulated"; that he believed that the mother had "significant mental health issues that are not being addressed"; and that the mother had "disappeared for a while.  She took off to Florida."  In response, the court told the mother's attorney that it "trust[ed] [his] instincts" and that if he thought the mother needed a GAL and the Department did not believe otherwise, then the court was "inclined" to issue the order.[4]

[¶6] In response to the court's inquiry about the role the GAL would play, the attorneys stated that the extent of the GAL's authority to make decisions on the mother's behalf would depend on how the court crafted the appointment order.  The court then stated that it planned to "give the [GAL] the full standard . . . range of authority."  After this brief colloquy, the court stated that it was "satisfied" and that it would "go ahead and order" the appointment of a GAL.

[¶7]   Two weeks later, on September 14, 2023, a different judge (*Bristol, J.*) issued an order appointing the GAL for the mother.[5]   The order

---

[4] When asked by the court, the child's GAL stated that she supported the appointment of a GAL for the mother.

[5]  It is unclear why the judge signing the written order was not the same judge who had participated in the August 31 conference.  Given the consequential nature of the order, this is not the best practice.

stated that the court was relying upon "representations of counsel" when determining that it was appropriate to appoint a GAL for the mother. The order cited no evidence of incompetency to support its determination. Using a form order for appointing a Rule 17(b) GAL, the court named the GAL and listed the standard panoply of a GAL's duties without limitation.[6] Pursuant to the order,

---

Coincidentally, on the same day the court appointed the GAL, the mother went to a hospital due to depression and anxiety and was found to have met the criteria for acute psychiatric involuntary hospitalization. She was involuntarily hospitalized for about a month.

[6] The order describes the GAL's duty and authority as follows:

**A.** If this appointment is made due to a finding of incompetence, and the GAL believes the finding should be reconsidered, the GAL shall file a motion to that effect with the Court.

**B.** The GAL shall be provided access to all pleadings, reports, and records relevant to the case to which the party for whom this GAL is appointed has access.

**C.** The GAL shall be relieved of: (i) any duty or obligation to conduct an independent investigation of any facts related to this proceeding; (ii) any duty or obligation to have face-to-face contact with the party for whom a GAL is appointed on a set scheduled basis; and (iii) any duty or obligation to report to the parties and the court in writing.

**D.** The GAL shall have face-to-face contact with the party for whom a GAL is appointed pursuant to this Order as often as events and developments in this case warrant. The GAL shall conduct such investigation of the facts related to this proceeding that, in his/her independent judgment, is reasonably necessary to serve her interests.

**E.** The GAL shall attend and observe all court proceedings in this case. The GAL shall have the right to be heard in any court proceeding in this case. The GAL is further authorized to appear on the same basis as the party for whom this GAL is appointed in the present action, to present and defend any claims or causes of action on behalf of the party, including the presentation and submission of testimony and evidence at trial, and to make binding decisions on behalf of the party in this matter, including the compromise of any of the party's claims.

**F.** The GAL may file such motions, and take such other steps as are necessary to obtain legal counsel for the party for whom this GAL is appointed.

**G.** The GAL shall be relieved of the rights, duties, and responsibilities provided by the Maine Rules of Guardian ad Litem, and more particularly, the Standards of Practice for Guardians ad Litem in Maine Courts because they are inconsistent with the provisions of this Order. The obligations of a Rule 17(b) Guardian are more closely aligned with those of a fiduciary, such as a GAL appointed for an

the GAL was "authorized to appear on the same basis as the party for whom this GAL is appointed in the present action" and "to make binding decisions on behalf of the party in this matter, including the compromise of any of the party's claims." The jeopardy hearing was continued generally, with a plan to schedule the case for docket call several months out to give the GAL time to work on the case.

**B.      Pre-jeopardy hearing developments, September 2023 to May 2024**

[¶8] In a filing submitted in mid-December 2023, the Department moved to continue the jeopardy hearing and referred to a conference that the court had apparently held with counsel four days earlier. The conference was not recorded or entered on the docket. In the motion, the Department recited that, at that conference, "[t]he parties [had] agreed that a CODE evaluation[7] would

---

> incapacitated person by the Probate Court. However, a Rule 17(b) GAL's authority and obligations concern only the present litigation and no other aspects of the life of the party for whom this GAL is appointed.
>
> **H.** The Order shall serve as authorization for the GAL to communicate with the medical treatment providers of the party for whom this GAL is appointed as necessary to understand the nature and extent of that party's illness, the impact of that illness on the party's ability to act on the party's own behalf, and the impact of the party's illness on the relief that the party may seek in the proceeding.

Section ten, entitled "General Provisions Applicable to All GAL Appointments," includes a provision stating, "The GAL shall make the wishes of the party for whom this GAL is appointed known to the court if the party has expressed them, regardless of the recommendation of the GAL."

[7] "CODE" refers to a court-ordered diagnostic evaluation.

be helpful" prior to the jeopardy hearing and that neither the attorney for the mother nor the GAL for the mother objected to a continuance of the hearing for that purpose. The court (*Bristol, J.*) granted the motion, and a few weeks later, a different judge (*Montgomery, J.*) issued an order directing the mother to undergo the diagnostic evaluation. The evaluation was conducted in February and March 2024.[8]

## C.     The jeopardy hearing, May 2024

[¶9]   The jeopardy hearing, which the mother attended, was held on May 9, 2024, and related to the two children who were the subject of the proceeding, including the child at issue here, *see supra* n.2. *See* 22 M.R.S. § 4035 (2026). At the start of the hearing, the court (*Dufour, J.*) addressed the mother's attorney's request to withdraw, which had been filed in April and reported "a fundamental disagreement" about how to proceed and which the court had previously denied. Another attorney also appeared for the mother at the hearing and informed the court that the mother had retained his firm to represent her. The Department, the mother's GAL, and the children's GAL

---

[8]  The CODE report, admitted as an exhibit at the jeopardy hearing, describes problems affecting the mother that relate to dysregulation, confused thinking, incoherence, and a compromised understanding of reality. Nonetheless, the report indicates that the mother acknowledged the purpose of the evaluation and gave verbal permission for the examination and for the results to be released to the Department. Relatedly, at the jeopardy hearing, the examiner testified that the mother's GAL had told him that she thought that the mother was capable of providing information and participating in the evaluation.

8

objected to the mother's initial attorney's withdrawal on the grounds that there had already been several continuances and that the case needed to proceed. *See* 22 M.R.S. § 4035(4-A). The court ordered that the hearing would be held that day and directed the mother's initial attorney and the retained attorney to work together to represent the mother at the hearing.

[¶10] Before any evidence was presented, the mother's GAL stated, "I've been discussing this with my client – she is asking to allow us to try and craft [an] agreement with the Department and to not have the hearing today on jeopardy." Because of the limited availability of the psychologist who had performed the CODE, the court commenced the hearing to allow the psychologist to testify, with a plan to then recess so the parties could explore an agreement.

[¶11] The psychologist testified about the mother's delusions and difficulties with thought processes and focusing, and the effects of these conditions on her ability to parent. The psychologist indicated that the mother's intellectual skills were not compromised but that she had "diminished capacity with other cognitive skills." He testified that she had shown improvement when hospitalized and on an "antipsychotic antidepressant."

[¶12] The court also took testimony from the children's resource parent and the Department's caseworker. The resource parent testified in part about erratic behavior by the mother that was of sufficient concern to warrant her obtaining a no-trespass order. The caseworker testified about the circumstances leading to the initiation of the child protection proceeding, including her observations of the state of the mother's home, and about the statement to the caseworker by one of the children that she had not been to school in the past two days because the mother had told the child that it was dangerous to be there.

[¶13] After the court took a recess and the parties conferred, the attorney for the Department advised the court that the parties had reached an agreement and that "all parties in this room" had seen the agreed-to order. The proposed order provided for a cessation of efforts to reunify the mother with the older child but continued reunification services with the younger child. The mother's GAL noted, however, that the mother did not agree to ceasing reunification efforts as to the older child, despite the Department's earlier statement. When the court asked the mother if she wished to speak, she declined. The court then told the mother that there would be "other opportunities moving forward," such as judicial review hearings and family

team meetings, and that, if the mother wanted to return to court before the review scheduled for July, "you have attorneys that you can . . . consult with about that, and they can file motions for expedited hearings."

[¶14]  The resulting jeopardy order, issued later that day, stated that the mother was unable to provide adequate care for the children as a result of her "untreated significant mental health" concerns.  It noted that an evaluating doctor found "several risk factors" for the mother and that her "mental health has had a negative impact on her ability to care for herself and her children."  The order provided that the Department was to maintain custody of the children.  After the hearing, the mother's first lawyer renewed his motion to withdraw, again citing material differences regarding "how [to] best conduct legal representation," and the court granted this motion.  The mother's retained counsel remained in the case.

## D.    The August 29, 2024 hearing

[¶15]  In late August, the court (*Hathaway, J.*) held a judicial review and permanency planning hearing, which the mother attended along with the Department's attorney and the mother's retained attorney.  *See* 22 M.R.S. § 4038 (2026); 22 M.R.S. § 4038-B (2026).  The appearance of the mother's GAL was delayed because of a scheduling conflict.  The Department's attorney

presented the court with a proposed permanency guardianship order for the older child. 22 M.R.S. § 4038-C (2026). The court asked whether the mother agreed to the order, and the mother's attorney answered that the mother did not. The Department's attorney indicated that the Department had communicated with the mother's GAL about the proposed order and that the mother's GAL supported the order on the mother's behalf. The mother's attorney then stated that he did not think he would "have the authorization from [his] client to agree" to any of the orders proposed at the hearing and stated, "I am anticipating that [the mother's GAL] is going to disagree with [the mother] on probably all of these questions and issues."

[¶16] The court indicated that it would continue the matter involving the older child for another judicial review, stating that the mother's attorney and the mother's GAL "will have to figure out . . . who [the mother's attorney] takes his direction from in a situation like this. But that's for you guys to figure out."

[¶17] The court then addressed a proposed order on judicial review and permanency planning relating to the younger child and asked the mother's attorney whether he was indicating that he could not "agree to that today without [the mother's GAL]." The attorney answered that he could not "personally, on behalf of [the mother,] . . . agree." The attorney added, "Whether

12

or not [the mother's GAL], in her role as the 17(b) guardian, will choose to do so for [the mother] is another matter."

[¶18] After an email was presented indicating that the mother's GAL agreed to the orders, the mother's attorney said that there was "a key difference between what my – what my client is saying and – what [the mother's GAL] is saying." He added that he did not think that "the two of them [had] to agree," but stated, "I don't think I'm taking my direction from [the mother's GAL]. I take my direction from my client of whether or not she has the final say – my client then has the final say on this issue. I believe that is – that's a matter of the – the 17(b) guardian's responsibility if I'm not mistaken."

[¶19] The Department's attorney then expressed the view that the mother's GAL stepped into the shoes of the mother and that the mother's attorney should be taking his direction from the mother's GAL. The court responded, "That's the way I see it. That is my understanding." The court then said that it was "still concerned about the position that [the mother's attorney] finds himself in, of having essentially two clients. One is his actual client; the other is the 17(b) guardian," who was not yet present. The court stated, "I think they need to have maybe a three-way discussion among them [about the] attorney/client relationship and come to some consensus, at least if not on the

decisions themselves, on who [the mother's attorney] is going to take his directions from because I think the purpose of the 17(b) guardian is, as [the Department's attorney] points out, to stand in the shoes of a person who is unable to advise their attorney what they want. And that's why the [c]ourt has appointed a 17(b) guardian."

[¶20] Later that day, after the mother's GAL became available remotely, the court reopened the hearing. The mother's GAL confirmed that she agreed to the permanency guardianship order as to the older child over the mother's objection, after having had discussions with the mother. When the mother's GAL was about to describe those discussions, the court interrupted the GAL, stating that it did not need to know the content of the discussions between the mother and the GAL, just that discussions had taken place. The mother's GAL then confirmed that the GAL agreed to the judicial review order for the younger child. After the court asked whether the mother's attorney had anything to add and the attorney answered that he did not, the court issued the judicial review order regarding the younger child.

E. **The judicial review hearing, March 27, 2025**

[¶21] The mother's retained counsel filed several motions to withdraw, reporting, among other things, that the attorney-client relationship had

"broken down." The court granted the last of the motions to withdraw, in December, and later appointed successor counsel to represent the mother.

[¶22] In late March 2025, the court held another judicial review hearing, at which the mother's newly appointed attorney was present, but the mother was not due to a work conflict. At that hearing, the mother's attorney stated that "we are in agreement" with the proposed judicial review and permanency planning order but did not explicitly identify whom "we" referred to. The mother's attorney noted that the mother was now living in Florida and was engaged in some services there, though those services "may not meet what the Department wants to see." The court stated that the proposed order would "maintain[] the status quo" but that an anticipated petition for termination of the mother's parental rights would "start a new track in this case."

[¶23] The resulting judicial review order, issued the same day, stated that the mother was "not involved in any services to the Department's knowledge" and that the assigned caseworker had attempted to engage with the mother, but that the mother had "asked the caseworker to stop communicating with her" and stated that she would "find 'another Department' to work her case." The order noted that the mother's visits with the child had been suspended in October 2024 as a result of the mother's behavior during the

visits and the child's reaction to her. The order stated that the Department nonetheless would be required to engage in reunification efforts with the mother.

## F.  The termination hearing, August 4, 2025

[¶24]  In June 2025, the court granted the Department's motion to amend a termination petition that had already been filed as to the child's father, so as to add the mother. *See* 22 M.R.S. § 4052 (2026).  In July, the mother's attorney filed a motion to withdraw reportedly pursuant to the mother's request, citing a breakdown of the attorney-client relationship.  The court (*Bristol, J.*) denied the motion.

[¶25]  The court (*Dieterich, J.*) held a hearing on the amended termination petition on August 4.  The mother's attorney and the mother's GAL were present, but the mother herself was not.[9]  The mother's attorney stated that she "believe[d] it [was] in [the mother's] best interest to avoid an aggravating factor which exists in Title 22, if [the court] were to proceed with the default hearing" and believed that the mother's GAL was "prepared to consent on behalf of [the

---

[9]  At the hearing, the mother's GAL indicated that she believed that the mother had chosen not to be present for the hearing.  She also stated that the mother did not believe that she had been "properly served in this case," though the mother's GAL believed that she had.

mother] and that . . . [consent was] in [the mother's] best interest."[10] The mother's GAL agreed that it was in the mother's best interest to consent to a termination order to avoid generating an aggravating factor. The GAL further asserted that, in her view, the court's appointment order gave her authority to consent to the termination of the mother's rights.

[¶26] The Department then stated that, although it agreed that the mother's GAL had decision-making authority, it preferred that the court nonetheless conduct an evidentiary hearing in order "to put evidence on why there is clear and convincing evidence of parental unfitness." The mother's attorney and GAL disagreed, stating that a hearing on the merits of the termination petition would risk creating an aggravating factor against the mother and thus would not be in the mother's best interest. The mother's attorney stated that if the court did proceed with a termination hearing, the attorney anticipated an appeal and therefore agreed that "the best interest of [the mother is] served by a consent." The mother's attorney also asserted that the GAL "has a specific order that has not been appealed that gives [the

---

[10] Title 22 M.R.S. § 4002(1-B)(C) (2026) provides that an involuntary termination of parental rights is an aggravating factor in any future proceeding involving a sibling. The existence of an aggravating factor may relieve the Department of its obligation to make reasonable efforts to prevent removal of the child from the home or to reunify the family. 22 M.R.S. § 4041(2)(A-2)(1) (2026); 22 M.R.S. § 4036-B(3) (2026).

mother's GAL] the authority to consent [to] an act in [the mother's] best interest."

[¶27] The court concluded that the mother's GAL held the authority to consent to termination on the mother's behalf and that, given that the mother's GAL and the mother's attorney believed that termination by consent was in the mother's best interest, it would enter a termination order based on that consent.

[¶28] The court did, however, allow the Department to present testimony from the mother's GAL to develop the record on the issue of consent. The mother's GAL testified that, although she had met with the mother "many times over the course of this case," they had not discussed the termination petition and that despite contacting the mother's attorney several times to discuss the case and to try to arrange a meeting with the mother, the mother had refused to meet. The mother's GAL stated that, consequently, the mother was not aware of the GAL's intent to consent on her behalf.

[¶29] The court issued the termination order, signed by the mother's GAL, that day. The written consent executed by the GAL recited that the mother waived her right to appeal. The mother's attorney requested that the waiver

language be deleted, but the court declined. The mother filed a timely appeal.

M.R. App. P. 2B(c)(1).[11]

## II. DISCUSSION

**A.** **The relevant law regarding appointment of a Rule 17(b) GAL and, specifically, a GAL for a parent in a child protection proceeding**

### 1. General principles governing the appointment of a Rule 17(b) GAL

[¶30]  When an attorney representing a client believes that the appointment of a GAL for the client may be warranted, the attorney can—and should—advise the court of that concern. *See In re Child of Mercedes D.*, 2018 ME 149, ¶ 17, 196 A.3d 888 ("We recognize that an attorney bears the 'responsibility to alert a court to [his or her client's] possible incompetence,' *Middleton v. State*, 2015 ME 164, ¶ 15, 129 A.3d 962, and we are not critical of mother's counsel for bringing her concerns to the court's attention." (alteration in original)); s*ee also* M.R. Prof. Conduct 1.14(b) ("When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the

---

[11] To the extent that the Department contends that the consent and the waiver of appeal contained within the consent effectively forecloses the mother's appellate rights, that contention is unpersuasive because, for the reasons set out in this Opinion, the appointment of the GAL—who executed the waiver—was based on a judicial process that was materially deficient.

client's own interest, the lawyer may take reasonably necessary protective action, including . . . seeking the appointment of a guardian *ad litem* . . . .").

[¶31] Before the court appoints a Rule 17(b) GAL, the person for whom the GAL is contemplated is entitled to due process—i.e., adequate notice and an opportunity to be heard. *See In re Guardianship of Chamberlain*, 2015 ME 76, ¶¶ 17-20, 118 A.3d 229 (noting that due process protections apply to guardianship determinations and applying the due process test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976)); *Eldridge*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (quotation marks omitted)); *Thomas v. Humfield*, 916 F.2d 1032, 1033-34 (5th Cir. 1990) (holding that a party to litigation is entitled to notice and a hearing before the court declares him incompetent and appoints a GAL); *Thomasson v. Thomasson*, 106 N.E.3d 1239, 1243-44 (Ohio 2018) (holding that prior to the appointment of a GAL for an adult, the adult is entitled to notice and a hearing on the matter) (collecting cases); *cf.* 18-C M.R.S. § 5-303(2) (2026) (stating that in adult guardianship proceedings, a copy of a petition to appoint the guardian and notice of a hearing on the petition must be served personally on the person for whom a guardianship is sought informing the person of the person's rights at the

hearing); *S.T. v. 1515 Broad St., LLC*, 227 A.3d 1190, 1201 (N.J. 2020) (holding that an attorney "acted in good faith when, pursuant to [the Rules of Professional Conduct], he requested the appointment of a guardian ad litem based on his reasonable belief" as to his client's cognitive and mental impairments, but that the attorney "erred in not copying his client on the motion for the appointment of a guardian ad litem" because the client "had the right to know about such a consequential motion filed by her lawyer").

[¶32]  After there is some showing or suggestion that a party may be incompetent, a hearing must be held.  The content of the competency hearing is flexible, but, ordinarily, medical evidence is presented for the court's consideration.  *See In re Est. of Wood*, 533 A.2d 772, 774 (Pa. Super. Ct. 1987) (stating that "[m]edical testimony is of great significance since it assists the trial court in determining the nature, severity, and consequences of an alleged incompetent's disability," while noting that lay testimony as to the person's spoken words, acts, and conduct may also be highly probative); *United States v. Muriel-Cruz*, 412 F.3d 9, 13 (1st Cir. 2005) ("In arriving at a competency ruling, the district court may rely upon various kinds of evidence, including written medical opinions and observations by the court, counsel, and defendant himself regarding the defendant's demeanor and fitness to stand trial."); *cf.* 15 M.R.S.

§ 101-D(1) (2026) ("The court may for cause shown order that the defendant be examined to evaluate the defendant's competency to proceed . . . ."); 18 U.S.C.A. § 4241(b) (Westlaw through Pub. L. No. 119-98) ("[T]he court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court . . . ."); *see generally In re Gower*, 113 Me. 156, 156, 93 A. 64, 65 (1915) (upholding appointment of a guardian where "[a] perusal of the record discloses that full hearing was had, and ample opportunity afforded for presentation of evidence. The petitioner was upon the stand, and much time was devoted to the inquiry as to her mental condition."); *King v. Robinson*, 33 Me. 114, 125 (1851) ("Whether the weakness of mind or decay of intellect is so great as to prevent their being regarded as *compos mentis*, is often a question of great delicacy and difficulty. One, which in many cases, can only be decided properly after a most careful and thorough investigation and examination of testimony.").

[¶33]  At the hearing to determine the competency of a party, the role of the attorney for the party whose competency has been questioned by the attorney is to advocate for what the attorney concludes is in the client's best interest.  *See generally United States v. Boigegrain*, 155 F.3d 1181, 1189

22

(10th Cir. 1998) (describing the scope of defense counsel's duties when counsel concludes that there is a competency issue and the defendant objects); *Bishop v. Superior Ct.*, 724 P.2d 23, 29 (Ariz. 1986) (noting that because of the unique nature of a hearing to determine competency to stand trial, the attorney's duty is to aid the judge in reaching the correct decision).

[¶34]  If a GAL is appointed, the role of the attorney for the party ordinarily is to follow the instructions of the GAL.  *See* Restatement (Third) of L. Governing Laws. § 24 (2000) ("When a guardian has been appointed, the guardian normally speaks for the client as to matters covered by the guardianship. . . .  The lawyer therefore should normally follow the decisions of the guardian as if they were those of the client."); *Billups v. Scott*, 571 N.W.2d 603, 605 (Neb. 1997) ("[A] guardian ad litem, generally speaking, steps into the position of the ward and, after considering the alternatives, asserts the right of the ward as the guardian ad litem sees fit.").[12]

---

[12]  That the attorney follows the instructions of the party's GAL is the general rule.  There may be unusual situations, however, where the court may conclude that the attorney should not adhere to the GAL's instructions if those instructions are contrary to the ward's expressed desires and the attorney representing the ward concludes that the GAL's instructions are contrary to the ward's best interests.  *See Schult v. Schult*, 699 A.2d 134, 142 (Conn. 1997); *Gross v. Rell*, 40 A.3d 240, 260 (Conn. 2012) (conservator).  The scope of a GAL's duty "lies within the parameters of the order of appointment," *Gerber v. Peters*, 584 A.2d 605, 607 (Me. 1990), and any circumstances requiring the deviation from the general rule should also be made clear by the court.  Similarly, if in the course of a proceeding, the attorney representing the ward has concerns as to whether the GAL's instructions are in the ward's best interest, the attorney should present those concerns to the court.  *See In re Child of Danielle H.*, 2026 ME 19, ¶ 12, 354 A.3d 349 (stating that with respect to GALs appointed for children in child protection proceedings, "[g]iven the GAL's central role in child protection

2.    **Appointment of a GAL for a parent in a child protection proceeding**

[¶35]  We now address those general principles as they apply specifically to child protection cases.

[¶36]  In a number of decisions, we have discussed the test that should be used to determine whether a parent is competent to proceed in a child protection case.  *See In re Child of Sherri Y.*, 2019 ME 162, ¶¶ 13-16, 221 A.3d 120; *In re Child of Mercedes D.*, 2018 ME 149, ¶¶ 15-16, 196 A.3d 888; *In re H.C.*, 2013 ME 97, ¶ 16, 82 A.3d 80; *In re David H.*, 2009 ME 131, ¶¶ 16, 21, 985 A.2d 490.  Pursuant to Rule 17(b), the court is authorized to appoint a GAL to represent the interests of an "incompetent person" generally.  We thus draw on the child-protection case law relating to the standards of competence applicable to a parent to inform our analysis of when and how a GAL should be appointed for a parent pursuant to Rule 17(b).

[¶37]  As the case law reveals, in determining whether a parent is incompetent, the court shall examine whether the parent is unable to answer questions appropriately and unable to understand the nature and consequences of the proceeding or is otherwise incompetent to assist counsel

---

proceedings, it is the responsibility of everyone involved, including the court, to address any deficiencies in the GAL's performance.").

and participate in the proceeding. *See David H.*, 2009 ME 131, ¶ 16, 985 A.2d 490; *see also H.C.,* 2013 ME 97, ¶ 16, 82 A.3d 80 (rejecting a claim that the parents lacked capacity to consent to termination; "nothing in the record suggests that the parents were mentally incompetent to participate in the proceeding. To prevail on a claim of incapacity, the asserting party must prove that he was unable to reasonably understand the nature and consequences of the consent."); *Sherri Y.*, 2019 ME 162, ¶ 16, 221 A.3d 120 (describing the test as whether the parent is "unable to understand the nature and consequences of the termination hearing, c[annot] answer questions, or [is] otherwise incompetent to participate in the hearing."). This is not unlike the framework that applies to the question of competency in the context of criminal proceedings. *See State v. Gerrier*, 2018 ME 160, ¶ 7, 197 A.3d 1083.

[¶38] The test for the appointment of a GAL in a child protection case is not whether the parent has a mental illness or incapacity that renders the parent unfit—the question of parental unfitness, whatever the cause, is one element of the ultimate termination decision. 22 M.R.S. § 4055 (2026). Rather, when it comes to the appointment of a GAL for a parent, the question focuses on the measure and quality of the parent's ability to participate meaningfully and effectively in the judicial process—more specifically, whether the parent

lacks sufficient capacity to assist counsel and to understand and participate meaningfully in the proceeding. *See Mercedes D.*, 2018 ME 149, ¶ 16, 196 A.3d 888 (holding that a mother's "limited cognitive functioning is not the same as being incompetent to proceed in" a child protection proceeding (alterations and quotation marks omitted)); *see also Dep't of Hum. Servs. v. K.L.W.*, 288 P.3d 1030, 1035 (Or. Ct. App. 2012) ("[I]f the parent lacks some mental capacity, but is able to make decisions and to communicate with and act on the advice of his or her counsel, then the appointment of a guardian *ad litem* is unnecessary because the guardian could provide little, if any, service to the parent, that would not be forthcoming from counsel." (quotation marks omitted)).[13]

## B.    Application of these relevant principles

### 1.    Due process

[¶39]  In this case, the mother was deprived of both components of due process.  As to the first element, no party contends that the mother was given notice of the discussion between counsel and the court when the court determined that a GAL should be appointed.  And as to the second, because the

---

[13]  Citing *Maine National Bank v. Petrlik*, 283 A.2d 660 (Me. 1971), the mother argues that a GAL in a proceeding to terminate parental rights (or at least in this proceeding) cannot consent to the termination.  *Petrlik*, however, does not foreclose a GAL from agreeing to a termination where the GAL has a reasonable basis to conclude that a consented termination is in the mother's best interest or when the undisputed facts "are to the advantage of" the incapacitated person.  *Id.* at 662.  This assumes, of course, that there is a proper order of appointment that authorizes the GAL to give such consent.

mother had no notice, she had no opportunity to be heard on the matter. The deprivation was immensely consequential because, as the direct result of counsel's discussion with the court, the court approved the issuance of an order (albeit issued several weeks later by a different judge) not only appointing a GAL but also authorizing the GAL to "make binding decisions" on the mother's behalf, "including the compromise of any" of her claims.

[¶40] Notably, the Department does not defend the process that resulted in the appointment of the GAL. Rather, the Department contends that, in the end, the appointment was not erroneous when seen in light of the evidence of the mother's mental health problems that might be relevant to competency, presented at various times throughout the proceedings. This contention, however, ignores the clear deficiencies in the appointment process itself. Beyond that, in a form of reverse engineering, the Department's position rests on evidence that was introduced into the record *after* the GAL was appointed— evidence, in other words, that the court could not have known when agreeing to appoint a GAL at the August 31 discussion and when actually issuing the order a couple weeks later.

[¶41] The record also reveals—and the written order of appointment confirms—that the decision to appoint a GAL was based solely on

"representations of counsel," not actual evidence. The input from the attorney representing a party whom the attorney suspects may be incompetent is certainly relevant. *See Muriel-Cruz*, 412 F.3d at 13 (asserting that given that counsel "enjoys a unique vantage for observing whether her client is competent . . . it would be untoward indeed to disqualify her from stating her opinion"). That limited information, however, did not provide the court with a sufficient basis to determine whether to appoint the GAL in the first place and, if a GAL were appointed, the scope of the GAL's authority. Particularly given a parent's constitutional interest and the deeply consequential issues that can be presented in a child protective case, *see Adoption of Isabelle T.*, 2017 ME 220, ¶ 4, 175 A.3d 639, the court has an independent duty to determine competency and whether decision-making authority should be delegated to a third person. The mere statement of counsel that the mother appeared "dysregulated" and has "significant mental health issues that are not being addressed" was not a sufficient basis for the court to determine that the mother was incapable of meaningfully assisting counsel and participating in the proceedings to the extent that warranted giving authority to the GAL to make fundamental and dispositive decisions affecting the mother's parental rights.

[¶42] Further, the absence of evidence about the mother's capacity to make decisions as the case progressed and to collaborate with counsel appears to have led to confusion, evident in subsequent court events, about the role of her attorneys. As noted above, if a party is incompetent to the extent that the party lacks the ability to meaningfully participate in proceedings, then, to the extent authorized by the order of appointment, the attorney ordinarily follows the GAL's instructions because the GAL stands in the shoes of the party. Without a hearing where the court could properly determine that appointment of a GAL was warranted, the various attorneys representing the mother seemed at times to follow the GAL's direction and at other times voiced an understanding that they should follow the mother's directions—including by filing this appeal after the GAL consented to the order the mother challenges here. The court acknowledged this confusion but left it to the GAL and attorneys to resolve the issue among themselves, even suggesting at one point that the mother's attorney had two clients: the GAL and the mother herself.

[¶43] For these reasons, it is manifest that the appointment of a GAL to act and make decisions for the mother was devoid of the process the mother was due.[14]

---

[14] The Department argues that it is too late for the mother to challenge the appointment of the GAL and that the mother is judicially estopped from raising the issue now because she could have

## 2. Prejudice and relief on remand

[¶44]  The next question is whether the mother was prejudiced by this constitutional deprivation.  When a court commits error in a termination proceeding, prejudice will be presumed and the burden then placed on the Department to demonstrate "that it is highly probable that the error did not prejudice the parents or contribute to the result in the case.  The [Department's] burden of persuasion is high.  Any doubt will be resolved in favor of the parent." *In re Michelle W.*, 2001 ME 123, ¶ 12, 777 A.2d 283 (alteration omitted) (quoting *In re Scott S.*, 2001 ME 114, ¶ 29, 775 A.2d 1144).

---

raised the issue in an appeal of the jeopardy order. Judicial estoppel applies when a party successfully asserts one position in a legal proceeding and then asserts a contrary position at a later stage. *See In re Child of Nicholas P.*, 2019 ME 152, ¶ 16, 218 A.3d 247.  Here, it is unclear whether the mother herself ever fully agreed to many of the orders entered in this matter that were significant, and it *is* clear from the record that she opposed some.  Even if judicial estoppel could apply in some circumstances similar to those presented here, we decline to invoke it in this case given the unique development of these proceedings, where the mother was denied due process in the appointment of her GAL very early on; where, after the GAL was appointed, including in the proceedings associated with the jeopardy hearing, the court and the mother's attorneys were unclear as to the proper roles of her attorneys as between the GAL and the mother herself; and where the court told the mother directly that she would have future opportunities to express her views, creating the prospect that the mother believed she was not obligated to register a prompt complaint about how the GAL was appointed. *See Me. Educ. Ass'n v. Me. Cmty. Coll. Sys. Bd. of Trs.*, 2007 ME 70, ¶ 17, 923 A.2d 914 (citing Supreme Court authority for the proposition that there is no "mechanical test" for determining the applicability of the judicial estoppel doctrine, and its purpose is "to protect the integrity of the judicial process").  The Department's arguments of unpreserved error, waiver, and judicial estoppel are further weakened by its own assertion that the mother's "mental health circumstances were extreme enough" to justify the appointment of a GAL. *See Pate v. Robinson*, 383 U.S. 375, 384 (1966) ("[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial.").  Because the appointment process was fatally deficient and the succession of the mother's lawyers were uncertain whose instructions they should follow—the GAL's or the mother's—the Department's claims of a procedural default, no matter the form of those arguments, are unpersuasive.

[¶45]  On the record before us, we must conclude that the Department has not cleared that "high" burden of establishing that the error in process was not prejudicial or did not contribute to the final result of termination by consent.  We therefore must vacate the judgment and remand for further proceedings before the trial court.

[¶46]  Two central questions arise regarding the process that will govern this case on remand.  The first focuses on the issue that causes us to vacate the judgment, namely, how now to determine the mother's competence.  The second question concerns the extent to which the earlier proceedings must be set aside.  We address these two issues seriatim.

### a.  Competency determination

[¶47]  As the first step to be taken on remand, the court must hold a hearing to determine whether a GAL should be appointed based on the mother's capacity, because such a determination is the necessary predicate to all further proceedings.  The record is replete with ongoing indications of the mother's mental health challenges, and, based at least on the motions to withdraw filed by a succession of attorneys for the mother, there is a suggestion that the mother has difficulties working effectively with counsel.  Although much of that information bears more on parental unfitness than on competence

for purposes of Rule 17(b), the latter is an open question especially given that no party—not even the mother—has asserted to us that the mother *is* competent. It is therefore an issue that needs to be addressed and adjudicated. The question we must address is whether that determination should be of the mother's *current* competence or whether it would be appropriate for the court to consider whether to reconstruct and make a *retrospective* determination of the mother's competence throughout the proceedings, where a retrospective finding that the mother was competent throughout could potentially salvage the proceedings that have already occurred.

[¶48]  Courts have found that, in some circumstances, a retrospective determination of competency is permissible, but such an approach is "disfavored." *Clayton v. Gibson*, 199 F.3d 1162, 1169 (10th Cir. 1999). As the Supreme Court of the United States has concluded, a nunc pro tunc determination of competency faces "inherent difficulties . . . under the most favorable circumstances." *Drope v. Missouri*, 420 U.S. 162, 183 (1975); *see Pate v. Robinson*, 383 U.S. 375, 387 (1966) ("But we have previously emphasized the difficulty of retrospectively determining an accused's competence to stand trial."); *Dusky v. United States*, 362 U.S. 402, 403 (1960). The test used in other jurisdictions, which we find useful, is whether a hearing to determine

competency retrospectively would be "meaningful." *Clayton*, 199 F.3d at 1169; *see McGregor v. Gibson*, 248 F.3d 946, 962-63 (10th Cir. 2001); *Reynolds v. Norris*, 86 F.3d 796, 802-03 (8th Cir. 1996). "A 'meaningful' determination is possible where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original . . . proceedings." *Reynolds*, 86 F.3d at 802.

[¶49] We conclude that, given the particular circumstances of this case, a nunc pro tunc hearing to determine the mother's competence would not be sufficiently meaningful to provide a present assurance that her due process rights were—and are—protected. As we discuss below, *infra* ¶ 54, a child protective proceeding comprises multiple interrelated chapters. Unlike a criminal case, for example, where the question may be the quality of a defendant's competence at a specific or circumscribed time, such as at trial, the issue here would be the mother's competence over a broad span of time, starting with when the court issued the GAL appointment order in September 2023, continuing to the jeopardy hearing the following spring, then multiple review hearings, and concluding with the termination hearing held in August 2025—an overall span of nearly two years that ended around a year ago. Then,

within those points on the timeline, a court would also need to consider the mother's competence between court events, when she was consulting with her succession of attorneys, talking with her GAL, and facing and considering the decisions she would need to make as the case moved forward in its various phases. Although the passage of time "is not an insurmountable obstacle," *id.* at 803, it is relevant, *McGregor*, 248 F.3d at 962. And even the lapse of more than one year can be enough to foreclose the appropriateness of a retrospective competency determination. *Dusky*, 362 U.S. at 403.

[¶50] We recognize that records were generated from the mother's involuntary hospitalization in September and October 2023, and a report resulted from the court-ordered diagnostic evaluation.[15] The availability of such information is germane to the question of whether a nunc pro tunc assessment would be proper. *McGregor*, 248 F.3d at 962. But those records are limited in time, and while they may have some indirect bearing on competence, they were not the product of evaluations for legal competence, which have a unique and specific purpose and therefore unique and specific content.

---

[15] The CODE report refers to several other reports, but they are not included in the record, so we cannot gauge whether they would have any value if the court were to consider them during an attempt to reconstruct the level of the mother's past competence.

[¶51]  Applying these and the other factors that courts have employed on this question to the particular circumstances of this case, *see Clayton*, 199 F.3d at 1169 (identifying four factors, including the passage of time and the availability of medical records), we determine that a "meaningful" nunc pro tunc determination of the mother's competence during the relevant portions of the development of this case is not realistic.[16]  Therefore, on remand, the court shall conduct a hearing to determine whether the mother is presently competent.[17]

### b.    Scope of remand

[¶52]  We acknowledge that determining the scope of the proceedings to be held on remand—in other words, how far back procedurally the case must be unwound after the court determines whether to appoint a GAL for the

---

[16]   As our discussion indicates, our conclusion here should not be construed as a categorical prohibition against nunc pro tunc competency determinations.  Rather, we remand for a determination of the mother's present capacity because of the specific circumstances presented in this appeal.

[17]  If, after a competency hearing, the court determines based on the mother's current functioning that a GAL should be appointed, a GAL other than the person who served previously shall be appointed.  Nothing in the record casts doubt about the capabilities and the good faith approach of the person who has served as the GAL to date.  If, however, a GAL is appointed on remand and given the authority to make dispositive decisions in the case; if the Department pursues the termination petition as to the child at issue here, *see* 22 M.R.S. § 4052(2-A) (2026) ("The department shall file a termination petition . . . [w]hen a child has been in foster care for 15 of the most recent 22 months."); and if the GAL is authorized and called upon to decide whether to consent to the termination of parental rights, that decision should not be clouded by any appearance that the consent was preordained given that the present GAL has already rendered that consent.  Whether a successor GAL reaches the same conclusion as did the original GAL, that decision should be made independently based on contemporary circumstances and considerations.

mother—is delicate and challenging because of the highly substantial interest in achieving permanency for the child, whatever that may look like after a judicial determination. *See* 22 M.R.S. § 4003(4) (2026). Even as we give weight to this principle, however, given the error affecting the appointment of the mother's GAL, we must set aside the orders that were entered afterward, starting with the jeopardy order.

[¶53] The appointment of the GAL for the mother was foundational and served as the predicate for everything that followed, including the jeopardy hearing.[18] The effect of the appointment was perhaps most salient at the termination hearing, where the termination order was explicitly and entirely predicated on consent given by the GAL pursuant to the plenary authority created in the appointment order. But more than a year earlier, the jeopardy order based on the parties' partial agreement contained underlying findings that were unfavorable to the mother. Because that order was based on the direct participation of the GAL, whose appointment was the result of an

---

[18] Although the flawed appointment process was foundational, it did not constitute a structural error. A structural error is one that requires the judgment be set aside without consideration of the actual effect of the error. *State v. Burdick*, 2001 ME 143, ¶ 27, 782 A.2d 319 (explaining that a structural error is "intrinsically harmful" and requires the judgment to be vacated automatically, without regard to the effect the error had on the overall proceedings). Here, in contrast, the judgment is not subject to automatic reversal because, as we discuss above, *supra* ¶¶ 44-45, if the Department had been able to demonstrate to the requisite standard that the error was harmless, we would affirm the judgment. *See In re Michelle W.*, 2001 ME 123, ¶ 12, 777 A.2d 283.

insufficient process, the basis for the order is called into question and therefore requires a new hearing. Thus, based on the particular development of this case, the remand must encompass more than the termination hearing and instead must reach back as far as the jeopardy phase of the case.

[¶54] For another, related reason, the case should return to the jeopardy phase, rather than only to the termination order, because of the general statutory framework governing child protection proceedings. Although these cases proceed in multiple steps—including the jeopardy hearing, judicial reviews, and the prospect of a termination hearing, *see* 22 M.R.S. §§ 4035, 4038, 4054 (2026)—the process itself is integrated, and each step stands on the shoulders of the previous ones. This is why, for example, the court may take judicial notice of orders already issued and other actions already taken in the same proceeding. *In re Caleb M.*, 2017 ME 66, ¶ 23, 159 A.3d 345. Because of the unitary character of a child protection proceeding, the consequential flaw in the appointment process, which occurred early in the evolution of the case, taints the subsequent proceedings. The remand here therefore requires more than a retrial on only the termination petition because the termination hearing that was already held cannot be surgically isolated from other proceedings that were also compromised by the improper GAL-appointment process.

[¶55]   On remand, the trial court will be called upon to make discretionary decisions about the procedural path going forward, affecting both the hearing on whether a GAL should be appointed for the mother and the course the case will take after that decision is made, starting with the jeopardy phase.  For example, to assist the court in its determination of the mother's competency, the court may consider whether, before the competency hearing is held, a competency evaluation of the mother is warranted.  And once a competency determination is made, the court must consider the adjudicatory process and how best to proceed to jeopardy and termination hearings expeditiously for the child's benefit but in a way that is consistent with the mother's rights.[19]  We leave those decisions to the sound judgment of the trial court.

### III.  CONCLUSION

[¶56]  On the record before us, there is every reason to conclude that the court, the mother's appointed GAL, and the succession of lawyers representing the mother were attempting to act in what they considered to be the mother's best interest.  Rather than exposing the mother to the risk of an aggravating

---

[19]  The child has now been in foster care for almost three years, a length of time that supports proceeding to a termination hearing quickly.  The Child and Family Services and Child Protection Act statute does not appear to prohibit consolidation of the termination and jeopardy hearings so long as the court makes separate determinations.

factor that could bear on her rights regarding her other children, the decision by the mother's GAL and the mother's lawyer to consent to termination may have been wise. That, however, is not the issue before us. Instead, the question presented here is whether the GAL's appointment occurred in a manner that was consistent with the mother's constitutional right to due process. It did not. The violation of the mother's rights when her GAL was appointed was plain and consequential. The judgment must therefore be vacated. On remand, the court must hold proceedings that protect the mother's due process rights while also recognizing the child's right to a swift permanency determination.

The entry is:

> Judgment vacated. Remanded for further proceedings consistent with this opinion.

––––––––––––––––––––

CONNORS, J., concurring.

[¶57] I concur with the entirety of the majority's reasoning and conclusions, except that I would leave the scope of the proceedings on remand to the trial court, which will be in the best position to address the circumstances as they present to it at that time.

Taylor Kilgore, Esq. (orally), Kilgore Law, PLLC, Turner, for appellant Mother

Aaron M. Frey, Attorney General, and Hunter C. Umphrey, Asst. Atty. Gen. (orally), Office of the Attorney General, Bangor, for appellee Department of Health and Human Services

Augusta District Court docket number PC-2023-24
FOR CLERK REFERENCE ONLY